657 So.2d 514 (1995)
Mr. and Mrs. Wayne BARRE, et al.
v.
Dr. Joseph M. NADELL, et al.
Nos. 94-CA-1883, 94-CA-1884.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1995.
*515 Russ M. Herman, Mark R. Wolfe, Charles O. Taylor, T. Daniel Pick, Herman, Herman, Katz & Cotlar, New Orleans, for plaintiffs, Mr. & Mrs. Wayne Barre, et al.
Stewart E. Niles, Jr., Patricia A. Bethancourt, Jones, Walker, Waechter, Poitevant, Carrere & Denegre, New Orleans, for defendants, The Administrators of the Tulane Educational Fund, d/b/a Tulane Medical Center Hosp.
Before BARRY and CIACCIO and PLOTKIN, JJ.
PLOTKIN, Judge.
The sole issue that we are called on to resolve in this case is whether the trial judge, in a bench trial, was manifestly erroneous or clearly wrong in finding that the defendants did not breach the standard of care and thus absolving them of any liability for medical malpractice. We affirm.

I.

Medical Facts
On September 19, 1983, two year old Michelle Barre underwent cranial facial surgery in an effort to correct a facial deformity secondary to her torticollis. Michelle had suffered from this deformity since her birth. *516 When Michelle was approximately two weeks old, her mother, Sharon Barre, noticed that when held, Michelle would always rotate her head towards the right side. In December of 1981, when Michelle was approximately two months old, Mrs. Barre took Michelle to her pediatrician, Dr. Nicholas Danna, after she noticed that the left side of Michelle's head was flattening. Subsequent to this visit, Mrs. Barre and her husband made several more visits to Dr. Danna, prompted in part by the fact that as Michelle aged, her facial deformity became more and more pronounced.
In August of 1982, the Barres again visited Dr. Danna, at which time he noted a definite flattening on the left side of Michelle's head. He referred the Barres to a neurosurgeon, Dr. Kott at East Jefferson General Hospital. However, because Dr. Kott was an adult neurosurgeon, he referred the Barres to Dr. Coulon at Ochsner Hospital, who was a pediatric neurosurgeon. Dr. Coulon performed a number of tests on Michelle and eventually made the diagnosis that Michelle suffered from infantile torticollis. According to Mrs. Barre, Dr. Coulon indicated that torticollis is a muscle problem in the neck that was causing Michelle's propensity to turn her head to the right. Thus, when Michelle would lie down, her head would always be resting on its left side. Given the softness of her infant skull bones, this constant resting had caused the left side of her skull to flatten out.
The Barres continued to take Michelle to Dr. Coulon and became increasingly concerned about Michelle's condition. Mrs. Barre indicated that Michelle appeared to have one eye larger than the other and that some children derisively referred to Michelle as "E.T." Subsequent to the birth of their second child, Lauren (who was normal in all respects), in May of 1983, the Barres again sought the advice of Dr. Coulon as to Michelle's condition. Mrs. Barre did not indicate what Dr. Coulon stated, but whatever it was, it prompted the Barres to seek a second opinion.
On August 9, 1983, they met with Dr. Joseph Nadell, a pediatric neurosurgeon at Tulane University Medical Center (Tulane). During this visit, Dr. Nadell asked Dr. Phillip Hendel, a plastic surgeon at Tulane, to examine Michelle. Both Dr. Nadell and Dr. Hendel confirmed Dr. Coulon's initial diagnosis that Michelle suffered from torticollis. Mrs. Barre indicated that both Dr. Nadell and Dr. Hendel recommended that Michelle undergo surgery to correct the facial deformity that had resulted from this condition. According to Mrs. Barre, the doctors indicated that "for maximum advantage" the surgery needed to be done within the next six months. Mrs. Barre testified that Dr. Nadell and Dr. Hendel indicated they would work as a team during the surgery, during which they would realign the bones in Michelle's head to correct the flattening.
In an effort to allay the understandable concerns the Barres had, Dr. Nadell arranged for them to meet with a group of parents whose children had undergone similar procedures. Mrs. Barre indicated that after this meeting, she and her husband "felt confident in going ahead with the surgery" although they were concerned about Tulane's status as a teaching hospital and were strongly opposed to any resident involvement in Michelle's operation, other than merely observing. The Barres were also concerned about AIDS and wanted to donate their own blood for Michelle. Ultimately, the Barres decided to go ahead with the surgery, with the caveat that no residents be allowed to operate on Michelle.
Approximately a week before Michelle's surgery, the Barres went to Tulane and donated blood for use in Michelle's surgery. On September 18, 1983, Michelle was admitted to Tulane, with her surgery scheduled for the next day. Mrs. Barre indicated that during the evening of the 18th, a number of residents came to Michelle's room to perform various tests on Michelle. Although Mrs. Barre did not specifically recall his visit, Michelle's medical record, the entirety of which was introduced at trial, contains a preanesthetic evaluation dated September 18, 1983, and signed by Dr. Rodney Reed, an anesthesiological resident at Tulane.
On the morning of the 19th, Michelle was awakened by her mother around 5:00 a.m. so that she could give Michelle a bath in Phisohex. *517 Eventually, the Barres retired to the waiting room to wait for the surgery to be completed. Mrs. Barre testified that she and Mr. Barre did not meet with Dr. Nadell on that morning, although they did visit with Dr. Hendel. Mrs. Barre also testified that she did not see Dr. Fleming, Dr. Nadell's resident; Dr. Cohen, the anesthesiologist in charge of Michelle's case; or Dr. Reed, the anesthesiological resident, that morning. Michelle's surgery commenced around 7:15 a.m.
Mrs. Barre then testified that sometime between 8:00 a.m. and 8:30 a.m., Dr. Hendel came out of the operating room and told her and Mr. Barre that everything was "going fine." Exactly what happened during the surgery is, of course, the focal point of this case. At this point, suffice it to say that the Barres next received a visit from Dr. Hendel, who informed them that something had gone wrong and that the surgery had been discontinued. According to Mrs. Barre, Dr. Nadell eventually came out of the operating room and told the Barres that Michelle had lost approximately 50 c.c.s. of blood, that she had experienced blood pressure problems, and that her heart was skipping every third beat. Mrs. Barre claimed that Dr. Nadell indicated that it was nothing catastrophic, that they would let Michelle recover, and that they would complete the operation at a later date.
Michelle was brought to the pediatric intensive care unit (PICU), where she immediately began to suffer from a variety of problems. She began having seizures, which necessitated a second surgery that day to insert a pressure monitor into her cranium. For the rest of September and until October 8, Michelle remained in the PICU. During this time period, Mrs. Barre indicated that Michelle was semi-comatose, that she never regained consciousness, and that she was on a respirator for part of the time.
Michelle's seizures continued and the Tulane doctors eventually induced a medical coma in order to give her brain a rest. She was moved out of PICU into a room on October 8, 1983. Eventually, the Barres requested that Michelle be transferred from Tulane to Children's Hospital and on November 7, 1983, Michelle was in fact so moved, remaining under the care of Dr. Nadell. On December 16, 1983, after suffering from a variety of problems while at Children's Hospital, Michelle died. The death summary in the Children's Hospital medical file listed the cause of death as "cardiorespiratory failure, and most probably secondary to edema, which was secondary to hypoproteinemia, hypoalbuminemia, and secondary renal failure."
Mrs. Barre testified that Michelle was moved from Tulane to Children's Hospital in part because she and her husband felt that Tulane had not been entirely honest with them. Over the vigorous objection of Tulane's counsel, Mrs. Barre indicated that while Michelle was still in Tulane, an unidentified nurse approached Mrs. Barre and told her that she and Mr. Barre "had not been told all that had happened to Michelle in the operating room" and that the nurse "felt a moral obligation to come forward." According to this nurse, Michelle had lost more than 50 c.c.s. of blood during her surgery, that she had in fact "coded," a medical term indicating cardiac arrest, and that she had been resuscitated. Mrs. Barre indicated that she was devastated by this news, because up until that point she had "absolutely no idea that things in the operating room were so catastrophic." This disclosure prompted her and Mr. Barre to request Michelle's transfer from Tulane to Children's Hospital.

II.

Procedural History
On March 24, 1984, plaintiffs brought suit against Dr. Nadell and Tulane. Concurrently, plaintiffs filed a medical malpractice complaint with the Insurance Commissioner's office. A Medical Review Panel composed of Dr. Clinton F. Miller, II, Dr. Richard W. Levy, and Dr. George W. Hoffman, and chaired by John R. Wellman, was duly convened to review plaintiffs' complaint. In its submission to the Medical Review Panel, plaintiffs contended that Dr. Nadell failed to perform Michelle's surgery in a careful and prudent manner, that he failed to diagnose a laceration in Michelle's dura timely, that he failed to perform the surgical procedure in a careful manner, and that he failed to treat a *518 patient with a declining condition timely and adequately. Plaintiffs also alleged that Tulane was negligent in failing to establish, inspect, and enforce appropriate hospital practices and in failing to provide medical care within national standards and that it was vicariously liable for the negligence of its employees and agents. On March 12, 1986, the panel rendered its opinion, in which it found that "the evidence does not support the conclusions that the defendants, TULANE MEDICAL CENTER and DR. JOSEPH NADELL, failed to meet the applicable standard of care as charged in the complaint." (Exhibit T-5.)
Subsequent to this decision, on June 10, 1986, plaintiffs brought suit against, inter alia, Dr. Nadell, Tulane, Dr. Hendel, Dr. Fleming, Dr. Cohen, Dr. Reed, and Judith Hanchey, a Certified Registered Nurse Anesthetist. Plaintiffs then sought to convene a second Medical Review Panel. The defendants objected to this on the basis that the first Medical Review Panel had had sufficient opportunity to review all aspects of the medical care rendered to Michelle, regardless of who the named defendants were. The trial court apparently adopted this argument and, on May 1, 1987, ordered dismissal of the second panel.
For reasons not entirely clear, plaintiffs filed another petition against the same defendants on June 15, 1987, which contained virtually the same allegations as the June 10, 1986 petition. In any event, the trial court ordered the two matters consolidated. Prior to trial, plaintiffs voluntarily dismissed their claims against all defendants except Dr. Cohen, Dr. Reed, and Nurse Hanchey, all of whom were members of the anesthesiology team that cared for Michelle during her surgery, and Tulane.
The matter went to trial before Hon. Gerald P. Fedoroff in September of 1993. After hearing nine days of testimony, Judge Fedoroff, again for reasons not clear from the record, continued the matter for 73 days. On December 6, 1993, Judge Fedoroff resumed the trial and heard testimony for two days, after which he took the matter under advisement. On February 11, 1994, Judge Fedoroff issued his decision in the matter. In its entirety, the Reasons for Judgment stated as follows:
I cannot repeat with any accuracy the mountain of scientific detail developed in this very complex and well tried case.
The focus was not so much on what was done in response to the incident. There is general agreement that the response was reasonable. The question is what should have been done before.
On this issue there is complete disagreement between the opposing experts. When experts of equal competence honestly disagree on proper care, plaintiff loses.
I do not suggest that the experts were equally persuasive. They were not. Dr. Gutierrez's testimony was supported throughout by authoritative texts. Dr. Kimble's opinion was not.
I conclude that the care provided by the anesthetic team was appropriate. Plaintiffs' actions will be dismissed.
Accordingly, Judge Fedoroff entered a judgment dismissing plaintiffs' action with prejudice. Plaintiffs have perfected this appeal.

III.

Standard of Appellate Review in a Medical Malpractice Case
Because this is a medical malpractice case, plaintiffs must satisfy the evidentiary burdens imposed by R.S. 9:2794. In pertinent part, those requirements are as follows:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along *519 with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.R.S. 9:2794(A). The plaintiff must prove each of these matters to a legal certainty by a preponderance of the evidence. La.R.S. 9:2794(C); Jones v. Rapides Gen. Hosp., 598 So.2d 619, 622 (La.App. 3d Cir.1992) (citing Wells v. Allstate Ins. Co., 510 So.2d 763 (La.App. 1st Cir.), writ denied, 514 So.2d 463 (La.1987)). However, the mere fact that the plaintiff was injured "does not raise a presumption of the physician's ... negligence." La.R.S. 9:2794(C); Galloway v. Baton Rouge Gen. Hosp., 602 So.2d 1003, 1008 (La.1992).
A hospital that employs physicians and other health care providers may be liable for their negligence through vicarious liability. Bolton v. Louisiana State Univ. Med. Cent., 601 So.2d 677, 681 (La.App. 2d Cir. 1992). Even so, the burden remains on the plaintiff to satisfy each of the essential elements prescribed by La.R.S. 9:2794(A). In the event that the plaintiff dies as a result of the alleged malpractice, it need only be shown that the malpractice deprived the plaintiff of a chance of survival. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1278 (La.1991). The plaintiff need not bear the "`unreasonable burden' of proving that the patient would have survived if properly treated." Id. (quoting Smith v. State through DHHR, 523 So.2d 815, 820 (La. 1988)).
Each of the burdens imposed on the plaintiff by La.R.S. 9:2794 is a question of fact. Id. at 1276. As such, they are necessarily subject to, and our review is curtailed by, the manifest error/clearly wrong standard of review. Id. In its most recent opinion explaining this standard of review, the Louisiana Supreme Court reaffirmed its prior explication of this standard in Rosell v. ESCO, 549 So.2d 840 (La.1989), explaining as follows:
The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to law and facts. La. Const. 1974, Art. V. § 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits.
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), we synthesized the "manifest error" and "clearly wrong" appellate review of facts limitations ... as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. * * * The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the findings in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. * * * In applying the manifest errorclearly wrong standard to the findings below, appellate courts must constantly have in mind that their review function is not to decide factual issues de novo.

*520 When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

Our opinion in Stobart v. State, 617 So.2d 880 (La.1993), was not intended to change that synthesis or to make the scope of appellate review of facts any more limited than described in Rosell.... As we stated in Ambrose v. New Orleans Police Ambulance Service, 639 So.2d 216, 221 (La.1994), "it was not our purpose in [Stobart] to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset."
Ferrell v. Fireman's Fund Ins. Co., 94-1252, pp. 3-4 (La. 2/20/95), 650 So.2d 742, 745 (emphasis added; citations omitted).
We find it necessary to delve into the question of the scope of our review in such detail because of the nature of the trial court's Reasons for Judgment issued in this case. Those reasons, though short on specifics, clearly make a credibility determinationthat Dr. Gutierrez's expert opinions were credible and that Dr. Kimble's were not. Applying the standards summarized above, we are thus bound to give great deference to the trial court's findings and may reverse them only if we find that the trial court's credibility determination was misplaced, given documents or other objective evidence set forth in the record.

IV.

Allegations of Negligence and the Surgical Procedure
At the commencement of their case, plaintiffs alleged a variety of potential negligent acts by defendants. In the end, however, this case boils down to only three purported errors by the anesthesiological team, to-wit: (1) failure timely to replace lost blood with either whole blood or other appropriate volume-maintaining solutions, (2) failure to insert into Michelle a central venous pressure (CVP) line, and (3) failure to use a catheter as a means of monitoring Michelle's urine loss. Plaintiffs called two expert witnesses, Dr. Colleen Matzke and Dr. Keith Kimble in an attempt to prove that these actions and inactions amounted to negligence;[1] defendants countered with the expert testimony of Dr. Juan F. Gutierrez. Before turning to the specifics of their testimony, we first offer the following account of the actual procedure performed on Michelle.
*521 The procedure that Drs. Nadell and Hendel intended to perform on Michelle to correct her facial deformity was a bifrontal craniotomy. This procedure was pioneered in France by one Dr. Tessier. In brief, the procedure requires that the surgeon expose the frontal and zygomatic bones in the skull by incising the skin and folding it over the supra orbital, that is, the region immediately above the eyes. Once this is accomplished, the surgeon then drills a number of burr holes in the area of the bone that he wishes to manipulate. This is done using a Rushing perforator, which is similar to an old-fashioned, hand-held drill. These holes are then enlarged using a Kerrison rongeur so as to allow a craniotome to be inserted into the burr holes. A craniotome is a nitrogen-powered cutting instrument that works much like a sabre saw. Using the craniotome, the surgeon drills from hole to hole, separating the bone flap from the surrounding bone. However, before the bone flap can be removed, it must be separated from the dura. The dura is a thick, fibrous material underneath the bone that protects the brain. To accomplish this separation, the surgeon uses another instrument called an Obwegeser dissector.
Dr. Nadell's operative report dictated the day after Michelle's surgery indicates that all of this was accomplished with little difficulty. He did note, however, that once the bone flap was removed, it became apparent that the dura had been lacerated. Uncontroverted testimony at trial reflected that this was not a breach of the standard of care and did not threaten Michelle's medical condition in any way whatsoever. Because the dura is relatively fibrous, it has few blood vessels in it and thus any bleeding associated with such a laceration is minimal. Moreover, these lacerations were promptly closed by Dr. Nadell.
Dr. Nadell's report then states that another bone flap, this one in the left fronto-parietal junction just off the midline, was to be removed. While making another cut with the craniotome, Michelle began to experience severe bleeding. Dr. Nadell testified that when the bleeding began, he finished cutting this area of the bone, dissected it from the dura, and discovered a laceration in the dura that turned out to be a venous lake. Venous lakes, also known as dural channels, contain massive amounts of blood, but because they do not follow any particular pattern in a child's brain and do not appear on CAT scans, they cannot be identified ahead of time. Thus, when the venous lake was punctured, it was entirely unexpected.
As a result of this puncture, Michelle lost a significant amount of blood, with estimates ranging from 60 c.c.s. to 150 c.c.s. Although Dr. Nadell quickly applied pressure and achieved hemostasis, Michelle developed bradycardia (slowing of the heart rate) and hypotension (low blood pressure). According to Dr. Nadell's post-operative note, after "usual resuscitative methods were carried out by anesthesia," Michelle developed "a complete heart block that responded to medication and a normal sinus rhythm and blood pressure then ensued." Meanwhile, the venous lake puncture was coagulated to prevent further bleeding.
After Michelle's vital signs were stabilized, the surgeons elected to abort the procedure. They closed the incisions and Michelle was moved from the operating room to the PICU. As noted above, she eventually died. The sole question in this case, then, is whether the anesthesiological team of Dr. Cohen, Dr. Reed, and Nurse Hanchey are culpable for Michelle's eventual death. We conclude that they are not, at least not with the proof adduced at trial.

V.

Analysis of Plaintiff's Medical Malpractice Claims

A.
Plaintiffs' initial complaint is that the anesthesiological team was negligent in its monitoring of Michelle's blood and fluid loss. Lying at the focal point of this dispute is the anesthesia chart kept during Michelle's operation. For the most part, Dr. Reed was responsible for keeping the chart, although both Dr. Cohen and Nurse Hanchey made various notations on the chart. This chart, a copy of which is attached hereto as Appendix "A," contains a chronological account of the major anesthesia-related events that occurred during Michelle's operation. For our *522 purposes, it is essentially composed of four parts: a listing of all anesthesia agents administered by the anesthesiologist, a time record of the patient's blood pressure and pulse, a listing of the cumulative fluids administered to the patient and an estimate of the patient's blood loss, and a section for various descriptive entries. Of the most concern to us is the account of Michelle's pulse and the estimate of her blood loss.
According to the chart, sometime after 10:20 a.m., Michelle's pulse dropped dramatically, from a high of 110 at 10:10 a.m. to below 50 at 10:30 a.m. Unfortunately, the exact pulse rates are not indicated by a dot, as they are for all other time references on the chart. Therefore, we cannot be sure if the downward-sloping line on the chart is an accurate representation of the pulse rate between 10:20 a.m. and 10:30 a.m. Dr. Reed, who made these notations, was not able to shed any light on this question because he died before his deposition could be taken. The chart further reflects that as of 10:15 a.m., Michelle had lost a cumulative total of 93 c.c.s of blood; she had also received intravenously 164 c.c.s of D5W-¼NS[2] as of 10:00 a.m., 117 c.c.s through the right-hand I.V. line, 42 c.c.s through the left-hand I.V. line, and 5 c.c.s through the arterial flush line.
Most importantly, the first page of the chart does not reflect that Michelle received any blood replacement fluids such as fresh frozen plasma, plasmanate, or packed red blood cells. However, the second page does reflect that all of these fluids were administered to Michelle in varying doses throughout the remainder of her surgery. Based on this, plaintiffs' experts opine as follows: when the venous lake puncture occurred sometime between 10:20 a.m. and 10:30 a.m., Michelle was already behind in total fluids (i.e., she had become hypovolemic). The additional blood loss stemming from the venous lake puncture, combined with her hypovolemia, resulted in a circulatory system volume that was insufficient to maintain profusion of her organs.
According to plaintiffs' experts, because significant blood loss is associated with neurosurgery, blood replacement should have been done on a c.c. for c.c. basis. In other words, as Michelle began to lose blood, it should immediately have been replaced by the anesthesiologist, who is in charge of administering all fluids to the patient. Alternatively, plaintiffs' expert Dr. Kimble argued in his rebuttal testimony that D5W-¼NS should not have been the maintenance fluid administered, but instead that D5W-NS or lactated Ringer's should have been given. According to Dr. Kimble, because of the chemical makeup of these solutions, both would have remained in Michelle's blood vessels longer than D5W-1/NS, thereby helping sustain volume sufficient to allow profusion.
In support of their theories, plaintiffs, during Dr. Kimble's rebuttal testimony, introduced two articles, one by Dr. Frederic A. Berry, Jr. of the University of Virginia and one by Dr. Shirley Graves of the University of Florida, that were presented at annual meetings of the American Society of Anesthesiologists and which purport to endorse the c.c. for c.c. theory or the use of fluids other than D5W-¼NS. Each does contain language that arguably supports plaintiffs' position. However, neither of these articles were subject to peer review, nor did they undergo editorial review prior to their inclusion in the text from which they were obtained. Moreover, they were general articles dealing with pediatric anesthesia and did not take into account any special considerations implicated in pediatric neurosurgery.
In contrast, defendants' expert witness, Dr. Gutierrez, relied on what he called "the Bible of pediatric anesthesiology," Dr. Robert M. Smith's Anesthesia for Infants and Children. Dr. Smith's text, which contains material specifically related to anesthesia considerations in pediatric neurosurgery, advises that blood replacement needs to occur once the patient loses approximately 10% of her total blood volume. In Michelle's case, this would have required that blood replacement begin once she lost more than 83 c.c.s of blood.
Plaintiffs make much of the fact that there is no indication on the anesthesia chart that any blood replacement took place between *523 10:15 a.m., at which time Michelle had lost 93 c.c.s of blood, and 10:30 a.m. The chart does indicate, however, that 160 c.c.s of blood were "pushed"[3] into Michelle sometime between 10:30 a.m. and 11:00 a.m. According to plaintiffs, the chart thus indicates that when Dr. Nadell punctured the venous lake, no blood was ready for infusion, that it needed to be retrieved from its storage location, the infusion mechanism assembled, and the blood warmed before any infusion could take place. Testimony indicated that these tasks normally could be accomplished in about five minutes, although the process could have been speeded up in response to an emergency.
We conclude, based on our review of the entirety of the record, that plaintiffs' contention is without merit. We must concur with the trial judge's evaluation that Dr. Gutierrez's testimony was more persuasive in light of the fact that it was supported by authoritative texts, while the testimony of Dr. Kimble and Dr. Matzke was not. Although we might have been inclined to accept Dr. Matzke's and Dr. Kimble's theories, we cannot say that the trial court's decision that his theory was more persuasive is manifestly erroneous. The standard of review applicable to this case precludes this Court from substituting its judgment for that of the trial court. As the court explained in Bolton v. Louisiana State Univ. Med. Cent.,
[O]f course, the effect and weight to be given expert testimony is within the broad discretion of the trial judge. The importance placed upon such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion. Where there are contradictory expert opinions concerning compliance with the standard of care, the reviewing court will give great deference to the conclusions of the fact-trier.
601 So.2d at 681 (citations omitted).
In addition, testimony at trial tended to indicate that once the venous lake was punctured, Dr. Reed was less concerned with keeping an accurate chart than he was with ensuring that proper care was rendered to Michelle. Thus, once the crisis resolved itself, Dr. Reed may simply have recorded the blood that was pushed into Michelle on the second page of the chart, rather than the first. Moreover, both Dr. Cohen and Nurse Hanchey testified that blood was already hung, i.e., ready for infusion, at the time the crisis occurred. In fact, Dr. Cohen testified that he had already begun pushing blood into Michelle when he looked up at the monitors and saw her pulse rate beginning to drop.
Plaintiffs argue that Dr. Cohen lied and that he was impeached on the stand. We will not substitute our judgment for that of the trial court in this regard. Although it did not state one way or the other whether it found Dr. Cohen credible, the trial court must have given at least some credence to his recollection of the critical events of that morning as evidenced by its judgment in defendants' favor. In other words, had the trial court rejected Dr. Cohen's testimony that blood was already being infused into Michelle at the time the crisis erupted, we think it more likely than not that the trial court would have found in plaintiffs' favor. Because it did not so find, we think it implicit that Dr. Cohen's testimony was determined to be credible and worthy of acceptance.
Furthermore, even if we were to agree that the choice of D5W-¼NS was inappropriate, this would not necessitate a reversal of the trial court's judgment. Dr. Smith's text clearly indicates that D5W-¼NS is the recommended choice for maintenance fluid in pediatric neurosurgery. A physician's choice to utilize one recommended treatment modality over another cannot, in and of itself, constitute negligence. Cf. Gamino v. Lakeside Hospital, 94-727, p. 19 (La.App. 5 Cir. 2/15/95), 652 So.2d 36, 43 ("[T]he fact that a physician chooses a less common approach or treatment does not infer negligence."); Moore v. Healthcare Elmwood, Inc., 582 *524 So.2d 871, 878 (La.App. 5th Cir.1991) ("[W]hen the plaintiff's expert would have chosen a more common procedure than one used by the defendant which is less common but accepted, the plaintiff has failed to prove a deviation from the standard of care."). It is also worthy of note that on cross-examination during rebuttal, Dr. Kimble admitted that had the anesthesia team opted to use lactated Ringer's or D5W-NS instead of D5W-¼NS, the net difference to Michelle would only have been an additional 8 c.c.s of fluid in her circulatory system. Plaintiffs never suggested, let alone proved, that an additional 1% of fluid in Michelle's circulatory system would have been sufficient to maintain profusion of her organs during the crisis.
Lastly, we cannot concur with plaintiffs' oft-repeated claim that Dr. Reed should not have been involved in this case. Although we do find it troubling that Tulane would allow a resident to do more than simply observe Michelle's operation in direct contravention of her parents' wishes, we find that Tulane was not negligent in allowing Dr. Reed, under the supervision of Dr. Cohen and Nurse Hanchey, to perform the duties of an anesthesia resident. Plaintiffs correctly point out that Dr. Reed had only been in the anesthesia residency program at Tulane for ten weeks prior to Michelle's operation. However, Dr. Reed was a board-certified internal medicine doctor with a specialty in Critical Care Medicine. Critical care medicine, according to unrefuted testimony at trial, involves much of the same monitoring equipment and requires knowledge of fluid management and therapy similar to that involved in anesthesia. Plaintiffs' claim in this regard is without merit.

B.
Plaintiffs' second major complaint is that the anesthesia team failed to insert a CVP line into Michelle. A CVP line consists of a needle that is inserted into a large vein in the patient. A transducer is then attached to the line, which is in turn attached to a monitor. The purpose of the CVP line and monitor is to keep track of the pressure in the venous side of the patient's circulatory system. According to plaintiffs, had such a line been inserted, it would have allowed the anesthesia team to learn earlier that Michelle was becoming hypovolemic (i.e., low bodily fluids) and thus needed to have blood infused. Both Dr. Matzke and Dr. Kimble were emphatic that failure to use a CVP line and monitor were breaches of the standard of care that contributed to Michelle's eventual death.
Conversely, Dr. Gutierrez testified that a CVP line and monitor were not necessary in this case. Primarily, he indicated that the data that would have been garnered from the CVP monitor did not outweigh the variety of risks associated with insertion of the CVP line. For example, Dr. Gutierrez stated that when the CVP line catheter is placed in a subclavian vein, the patient potentially could develop pneumothorax, chylothorax, or hemothorax. Likewise, when the CVP line catheter is placed in one of the jugular veins, there was the risk of kinking the catheter when the patient's head was moved, thereby impeding return of blood from the head. Dr. Gutierrez also stated that regardless of where the CVP line was placed, the patient ran the risk of suffering hematoma when the CVP line catheter was inserted. Furthermore, Dr. Gutierrez, in unrefuted testimony, indicated that much of the same data that the CVP monitor could provide was already available to the anesthesia team through other devices that were in use during Michelle's operation. In fact, Dr. Gutierrez's expert testimony reflected the opinions of both Dr. Nadell and Dr. Cohen that the CVP monitor was simply an alternative that was available to the anesthesia team, but that it was not required.
Plaintiffs attempt to assuage this testimony by pointing to the fact that when Michelle underwent surgery later on the 19th to insert a cranial pressure monitor, the anesthesia team opted to use a CVP line and monitor. However, this does not prove that the failure to use it during the initial surgery amounts to a breach of the standard of care. Each surgical procedure must be evaluated according to its individual circumstances and the risks implicated by the particular procedure undertaken. Thus, whatever use the CVP *525 line and monitor may have been during the later surgery is irrelevant to the issue of whether failure to use it during the earlier surgery constitutes actionable negligence.
In the end, we cannot accept this argument of plaintiffs. Their own expert witness, Dr. Kimble, freely admitted during direct testimony in plaintiffs' rebuttal that the data offered by the CVP monitor was "a little bit superfluous" and that the CVP data was merely "confirmatory" to the data already contained in the anesthesia chart. We conclude, based on the foregoing, that the anesthesia team's decision not to use a CVP line and monitor did not amount to negligence.

C.
Plaintiffs' final claim is that Michelle should have been catheterized. This would have allowed the anesthesia team to monitor Michelle's urine loss more closely, which might have afforded earlier notice that she was becoming hypovolemic. We reject this argument as well.
As indicated earlier, the procedure that Dr. Nadell was performing on Michelle was pioneered in France by Dr. Tessier. At trial, Dr. Nadell testified that Dr. Tessier's text advised that catheterization be done only in male patients when the procedure was anticipated to last more than six hours. Obviously, Michelle does not fall within those parameters. Despite this, the anesthesia team attempted to insert a catheter into Michelle, but was unsuccessful, for reasons undetermined. Moreover, Nurse Hanchey, Dr. Cohen, and Dr. Gutierrez all indicated that use of a pediatric urine collection bag was within the standards of care for 1983. This claim is also without merit.

VI.

Conclusion
In reaching our decision today, we point out that had we been sitting as the finder of fact, we might have concluded differently. However, Louisiana law clearly and unambiguously establishes that this is not a sufficient basis on which to reverse the lower court. The evidence adduced at trial on the issue of blood and fluid replacement and maintenance, use of a CVP line and monitor, and catheterization was lengthy and detailed. The trial judge, we are convinced, had a reasonable basis for his conclusion that the applicable standards of care were not breached in this case.
Michelle's death was tragic in the truest sense of the word. However, we find no basis on which to conclude that the trial court's decision was manifestly erroneous or clearly wrong. Therefore, we affirm the judgment of the trial court.
AFFIRMED.
*526 
*527 
NOTES
[1] We note that plaintiffs also solicited expert testimony from Dr. Richard W. Levy, who had been a member of the Medical Review Panel that initially reviewed this case. Dr. Levy was tendered and accepted as an expert in neurosurgery. As such, his expert opinions with respect to the anesthesiological care rendered in this case are of little value. See Green v. State through Southwest Louisiana Charity Hosp., 309 So.2d 706, 710 (La.App. 3d Cir.) ("The best evidence of the local community standards is found through testimony of other experts in the same field.") (emphasis added), writ denied, 313 So.2d 601 (La.1975).

In an apparent attempt to circumvent this problem, plaintiffs' counsel consistently asked Dr. Levy about his opinions concerning the anesthesiological care in this case "from the viewpoint of a neurosurgeon." However, during the traverse on his qualifications, Dr. Levy freely admitted that he has published no papers concerning pediatric anesthesia, in general or specifically related to pediatric neurosurgery, has never evaluated anesthesiology residents, and has never had occasion to review the performance of any anesthesiologists that resulted in formal evaluation submitted to a hospital. Thus, although we do not suggest that the trial court should not have recognized Dr. Levy as tendered, we do find that his opinions as to the anesthesiological care in this case, even from a neurosurgical standpoint, are of little probative value.
[2] D5W is a 5% dextrose solution in water; ¼NS is one-quarter normal saline.
[3] This term refers to blood being infused into the patient using a calibrated syringe connected to a three-way stopcock. The anesthesiologist draws blood from the unit of blood, turns the stopcock, and pushes the syringe down, thereby infusing blood into the patient in measured doses. This differs from the normal means through which blood is infused into adult patientsthrough a gravity-powered, gradual drip.