2016-0323 (La.App. 4 Cir. 12/15/16)

**Rose MINOR, et al.**

v.

**Dr. Washington BRYAN**

**NO. 2016–CA–0323**

Court of Appeal of Louisiana, Fourth Circuit.

DECEMBER 15, 2016

Rehearing Denied January 20, 2017

---

Jeffrey A. Mitchell, Hugo L. Chanez, THE COCHRAN FIRM–METAIRIE, 1 Galleria Boulevard, Suite 2130, Metairie, LA 70001, Monica C. Sanchez, MITCHELL SANCHEZ, LLC, 1 Galleria Blvd., Suite 2121, Metairie, LA 70001, Thomas M. Flanagan, Andy Dupre, Anders F. Holmgren, FLANAGAN PARTNERS, LLP, 201 St. Charles Avenue, Suite 2405, New Orleans, LA 70170, COUNSEL FOR PLAINTIFFS/APPELLEES–ROSE MINOR, KIMBAL MINOR, ROBERT REYNOLDS, AUREAN REYNOLDS

Trevor G. Bryan, TREVOR BRYAN, APLC, 650 Poydras Street, Suite 1400, New Orleans, LA 70130, COUNSEL FOR DEFENDANT/APPELLANT, DR. WASHINGTON BRYAN

(Court composed of Judge Paul A. Bonin, Judge Daniel L. Dysart, Judge Sandra Cabrina Jenkins)

PAUL A. BONIN, JUDGE

Cynthia Reynolds died as a result of complications incurred during an in-office hysteroscopy performed by Dr. Washington Bryan, an obstetrician-gynecologist. Contending that his treatment of their mother fell below the applicable standard of care, her children, Rose Minor, Kimbal Minor, Robert Reynolds, and Taurean Reynolds, requested a medical review panel. The panel found unanimously that Dr. Bryan's actions breached the standard of care, but could not state whether deviation "was directly related to her death." The plaintiffs subsequently brought suit against Dr. Bryan, seeking survival and wrongful death damages. *See* La. C.C. arts. 2315.1 and 2315.2. After the conclusion of a bench trial, the trial judge found that Dr. Bryan's medical treatment of Ms. Reynolds fell below the applicable stan-

dard of care, that this breach caused her death, and that the plaintiffs were accordingly entitled to damages.

Dr. Bryan appeals, arguing first that the judgment against him must be reversed because the plaintiffs failed to prove "that there is a bright-line national standard" that prevented him from performing Ms. Reynolds' procedure in-office. |₂Dr. Bryan next claims that the trial judge erred when he concluded that his deviation below the standard of care was a cause-in-fact of Ms. Reynolds' cardiac arrest and eventual death. In connection with this assignment, Dr. Bryan also argues that the trial judge was clearly wrong in concluding that Ms. Reynolds' post-cardiac arrest intubation was delayed for nine minutes, thus resulting in brain damage. Lastly, in response to the plaintiffs' alternate theory of liability, Dr. Bryan asserts that the trial judge erred in concluding that he failed to obtain informed consent from Ms. Reynolds for the surgery. Each of these assignments is governed by the clearly wrong/manifest error standard of review. *See McCarter v. Lawton*, 09–1508, pp. 3–4 (La. App. 4 Cir. 7/21/10), 44 So.3d 342, 346, citing *Barre v. Nadell*, 94–1883, p. 7 (La. App. 4 Cir. 6/7/95), 657 So. 2d 514, 519 (citations omitted). Upon our review of this matter, we conclude that the trial judge's findings with respect to the applicable standard of care, causation, and the alleged time discrepancy are not clearly wrong and are reasonable. We pretermit discussion of Dr. Bryan's informed consent argument. Simply put, even if we were to reverse the trial judge's informed consent ruling, Dr. Bryan would still be liable to the plaintiffs because we affirm the trial judge's conclusion that the plaintiffs established his liability in accordance with the Medical Malpractice Act. *See* La. R.S. 9:2794 and La. R.S. 40:1231.1, et seq.

We, therefore, affirm the judgment and explain our decision below.

**I**

We first examine this matter's factual and procedural history.

|₃Ms. Reynolds, who complained of post-menopausal bleeding, visited Dr. Bryan's office on May 2, 2008. As a result of his initial examination, Dr. Bryan diagnosed Ms. Reynolds with uncontrolled high blood pressure (200/124), uncontrolled diabetes, asthma, and sleep apnea. He also diagnosed her as obese. He discussed these co-morbidities with Ms. Reynolds and instructed her to see her primary care physician so as to get them under control. He also asked Ms. Reynolds to visit the emergency room for her high blood pressure. Ms. Reynolds also told him that she smoked one to four packs of cigarettes a day, and was allergic to Lidocaine.[1] He then examined Ms. Reynolds relative to her complaints. Dr. Bryan also ordered a pelvic ultrasound examination after noting that Ms. Reynolds had an enlarged uterus and a bloated belly.

Ms. Reynolds returned to his office on May 5, 2008. She had yet to see her primary care physician about her co-morbidities or visit the emergency room for her high blood pressure. Dr. Bryan testified that the ultrasound scan "suggested debris inside the uterus," and suspected that Ms. Reynolds was suffering from endometrial cancer. He then decided that Ms. Reynolds needed a CT scan of her abdomen. Ms. Reynolds, according to Dr. Bryan, would not go to the hospital in order to undergo the scan. He testified that Ms. Reynolds

---

1. While acknowledging that Ms. Reynolds claimed to be allergic to Lidocaine, Dr. Bryan testified that in his experience as her ob-gyn she was not in fact allergic to the pain medicine.

was deathly afraid of undergoing any type of procedure in the hospital and that they discussed the issue at length. Eventually, Dr. Bryan offered to perform an in-office hysteroscopy on Ms. Reynolds in order to evaluate her further.[2]

Ms. Reynolds next visited Dr. Bryan's office on May 8, 2008 for the hysteroscopy. Dr. Bryan requested that Ms. Reynolds undergo the procedure at his Gretna, Louisiana office, which is located adjacent to Ochsner Hospital, in the event complications developed during the procedure. Dr. Bryan's records reveal that Ms. Reynolds had not taken any medication to treat her hypertension or diabetes. She did not present any type of clearance from a primary care physician prior to the procedure. And, in violation of Dr. Bryan's office policy, she had also eaten a light breakfast prior to her arrival. Ms. Leslie Rachelle Collins, one of Dr. Bryan's employees, also testified that she observed Ms. Reynolds in the office waiting room prior to the procedure eating snacks out of a bag. She stated that she informed Dr. Bryan of this, and that it was a violation of office policy for a patient to eat or drink prior to undergoing the procedure.

At the outset of the procedure, Dr. Bryan administered Demerol for pain and valium for anxiety to Ms. Reynolds. And because she complained of tenderness, Dr. Bryan also gave her a para-cervical block with Lidocaine. Shortly thereafter, Dr. Bryan began the procedure. He noted that Ms. Reynolds was suffering from a great deal of bleeding in her endometrium, which made observation difficult. Because of this condition, Dr. Bryan did not believe that he could continue the procedure in his office. He, accordingly, recommended that she complete the procedure in the hospital. In discussing the matter, Ms.

Reynolds asked that her head be raised. Dr. Bryan elevated the head of the exam table and continued speaking with Ms. Reynolds. After making a soft cough, Ms. Reynolds fell silent. Dr. Bryan went to the head of the table, examined her, and discovered that she had no pulse and had stopped breathing. Thinking that she might be having an allergic reaction to the Lidocaine, Dr. Bryan gave her an injection of epinephrine. He then instructed his staff to call 9-1-1, while he performed mouth-to-mouth resuscitation and CPR on Ms. Reynolds. He did not intubate her because he did not have the proper respiratory equipment in his office. When he learned that the ambulance would be coming from West Jefferson Hospital, Dr. Bryan, at approximately 1:30 PM, notified Parish Anesthesia's resuscitation team, which was within walking distance of his office. The records reflect that the Parish Anesthesia team began resuscitative efforts on Mrs. Reynolds at approximately 1:39 PM. The resuscitation team could find no pulse and observed a "large amount of fluid" in Ms. Reynolds airway. They immediately intubated her and began CPR. The resuscitation team ceased their efforts at 1:45 PM, and paramedics then transported Ms. Reynolds to Ochsner Hospital.

Ochsner Hospital records indicate that Ms. Reynolds was unable to respond to verbal commands, had fixed pupils, was unresponsive, and that a trachea tube was inserted for breathing. Ms. Reynolds spent nearly two weeks at Ochsner, yet her condition did not improve. Her treating neurologist's final note diagnosed Ms. Reynolds with severe cognitive impairment. Similarly, Ochsner's discharge summary noted that Ms. Reynolds was unable to follow commands, did not exhibit volun-

---

**2.** A hysteroscopy is a medical procedure that allows a doctor to look inside a woman's uterus. It is performed with a hysteroscope, a thin, tube-like device that is inserted inside the woman's vagina.

tary movements, and that her neurological condition was not expected to improve. Accordingly, Ms. Reynolds was transferred to a long-term acute care facility, where she died on May 31, 2008, after involuntary movements on her part accidentally dislodged her breathing tube.

Claiming that Dr. Bryan had committed medical malpractice in the treatment of their mother, the plaintiffs requested a medical review panel. *See* La. R.S. 40:1231.8.[3] The panel subsequently rendered a unanimous opinion that, at the least, Dr. Bryan breached the standard of care: "The evidence supports the conclusion that the defendant, Dr. Washington Bryan, failed to comply with the appropriate standard of care as charged in the complaint." The panel members supported this conclusion by noting that while they individually do not perform in-office hysteroscopies "doing an office hysteroscopy on a patient this high risk is a breach in the standard of care." On the other hand, the panel members wrote that they were unsure about what actually caused Ms. Reynolds' cardiac arrest. In other words, the panel members indicated that "[w]hile the procedure done in the office may have increased the risk of harm to the patient, considering her compromised health status, we are unable to determine if this procedure was directly related to her death." Lastly, the panel members observed that they were "unable to determine whether or not consent was obtained, because there is no written record."

Shortly thereafter, the plaintiffs filed wrongful death and survival actions against Dr. Bryan, alleging that his breach of the standard of care caused them and their mother to suffer compensable damages. After discovery and motion practice—none of which is relevant to the present appeal—this matter proceeded to a bench trial. The trial judge took the matter under advisement after several days of testimony and, subsequently, issued a written judgment on December 23, 2015, in which he rendered judgment in favor of the plaintiffs and against Dr. Bryan.[4]

In his exhaustive reasons for judgment, the trial judge summarized the facts and testimony elicited at trial, set out the applicable law, and concluded that a national standard for gynecology applied to Dr. Bryan's treatment of Ms. Reynolds. He determined that the "standard of care for a patient with these co-morbidities, who is scheduled to undergo an in-office hysteroscopy, with the potential and eventual introduction of sedatives and a para-cervical block, is to ensure that the patient is medically capable of undergoing the procedure." Therefore, the standard of care in this instance required that Dr. Bryan "have appropriate life-saving equipment on hand." The evidence, the trial judge found, indicated that Dr. Bryan knew this and did not have the appropriate equipment on hand, yet proceeded with the procedure anyway. The trial judge also found that Dr. Bryan breached this standard, thus failing to exercise reasonable care in his treatment of Mrs. Reynolds, and that this failure was a proximate cause of her injuries because it set into motion a chain of events that led directly to her death. The

---

3. At the time of the medical review panel, the provisions of La. R.S. 40:1231.8 were found in La. R.S. 40:1299.41. The redesignation was brought about by House Concurrent Resolution No. 84 of the 2015 Regular Session.

4. The judgment, specifically, was entered against Dr. Bryan in the amount of $100,000, and against the Louisiana Patient's Compen-

sation Fund and the Louisiana Patient's Compensation Oversight Board in the amount of $427,281.72. *See* La. R.S. 40:1231.2 B(2). Dr. Bryan does not appeal any aspect of the trial judge's damage award. And neither the Patient's Compensation Fund, nor the Patient's Compensation Oversight Board, have sought appellate review of this judgment.

trial judge additionally found that "Dr. Bryan in deciding to do the in-office procedure did not adequately address the increased risks, including death, associated with Ms. Reynolds co-morbidities nor did he offer her a less invasive therapeutic alternative."

Following rendition, Dr. Bryan timely sought a suspensive appeal of the December 23, 2015 judgment.

## II

Here we examine the statutory law and jurisprudence governing the plaintiffs' medical malpractice claim against Dr. Bryan, and the applicable standard of review.

## A

■ The plaintiffs' petition alleges that their mother's death and their resulting damages are a result of Dr. Bryan's medical malpractice in his treatment of Ms. Reynolds. Section 1231.1 A(13) of Title 40 of the Louisiana Revised Statutes defines medical malpractice as "any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient...."[5] In order for a patient to prevail on a medical malpractice claim against his physician, the Legislature requires a claimant to prove by a preponderance of the evidence each of the three elements set out in Section 2794 A of Title 9 of the Louisiana Revised Statutes. First, the plaintiff must establish "[t]he degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a simi-

lar community or locale and under similar circumstances." La. R.S. 9:2794 A(1). Notably, "where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty." *Id.* Second, the plaintiff must establish that "the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill." La. R.S. 9:2794 A(2). Lastly, the plaintiff must prove that "as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." La. R.S. 9:2794 A(3). A medical malpractice plaintiff, therefore, *"must establish the standard of care applicable to the charged physician,* a violation by the physician of that standard of care, *and* a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom." *Pfiffner v. Correa,* 94–0924, 94–0963, 94–0992, p. 8 (La. 10/17/94), 643 So.2d 1228, 1233 (emphasis added).

## B

■ The burden in all medical malpractice cases falls on the plaintiff to establish by a preponderance of the evidence all elements of the medical malpractice cause of action. *See Montz v. Williams,* 16–145, p. 1 (La. 4/8/16), 188 So.3d 1050, 1051. " 'Each of the burdens imposed on the plaintiff by La. R.S. 9:2794 is a question of fact ... As such, they are necessarily subject to, and our review is curtailed

**5.** At the time of Ms. Reynolds' procedure, this provision was located at La. R.S. 40:1299.41 A.

by, the manifest error/clearly wrong standard of review.'" See McCarter, 09–1508, pp. 3–4, 44 So.3d at 346, citing Barre v. Nadell, -94–1883, p. 7 (La.App. 4 Cir. 6/7/95), 657 So.2d 514, 519 (citations omitted). Whether the plaintiff has met his burden is a question of fact, the resolution of which is subject to manifest error review and should not be reversed unless no factual basis exists for the finding and the record establishes the finding is clearly wrong. See Montz, 16–0145, p. 1, 188 So.3d at 1051. The assessment of factual conflicts in medical malpractice actions, including those involving the contradictory testimony of witnesses, lies squarely within the province of the trier of fact. See In re Dunjee, 10–1217, p. 5 (La.App. 4 Cir. 1/26/11), 57 So.3d 541, 546. The issue for a reviewing court to resolve when faced with a fact finding is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one; even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. See Mitter v. Touro Infirmary, 03–1608, p. 4 (La.App. 4 Cir. 4/21/04), 874 So.2d 265, 269.

This review standard is based, in part, on the trial court's ability to better evaluate the testimony of live witnesses, compared with an appellate court's sole reliance upon a written record. See Wooley v. Lucksinger, 09–0571, p. 50 (La. 4/1/11), 61 So.3d 507, 555. The standard therefore is based on "the proper allocation of trial and appellate functions between the respective courts." Rousset v. Smith, 14–1409, pp. 22–23 (La.App. 4 Cir. 9/23/15), 176 So.3d 632, 646, citing Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882. Consequently, when there are two permissible views of the evidence, the trier of fact's choice between them cannot be manifestly erroneous. See Montz, 16–0145, p. 2, 188 So.3d at 1051.

## III

Dr. Bryan, in his appeal, asserts four assignments of error. He first argues that the judgment against him must be reversed because the plaintiffs failed to prove "that there is a bright-line national standard" that prevented him from performing Ms. Reynolds' procedure in-office. Dr. Bryan next claims that the trial judge erred when he concluded that his deviation below the standard of care was a cause-in-fact of Ms. Reynolds' cardiac arrest. In connection with this assignment, Dr. Bryan also argues that the trial judge was clearly wrong in concluding that Ms. Reynolds' post-cardiac arrest intubation was delayed for nine minutes, thus resulting in brain damage. Lastly, in response to the plaintiffs' alternate theory of liability, Dr. Bryan asserts that the trial judge erred in concluding that he failed to obtain informed consent from Ms. Reynolds for the surgery. We review each of these assignments pursuant to the manifest error/clearly wrong standard of review. See McCarter, 09–1508, pp. 3–4, 44 So.3d at 346.

### A

We turn now to examine Dr. Bryan's first assignment of error in which he asserts that the judgment against him must be reversed because the plaintiffs failed to establish "that there is a bright-line national standard" that prevented him from performing Ms. Reynolds' hysteroscopy in-office. In this case, the trial judge, relying upon the testimony of medical review panel members Drs. Hogan and Guette, concluded that the applicable national "standard of care for a patient with these co-morbidities, who is scheduled to

undergo an in-office hysteroscopy, with the potential and eventual introduction of sedatives and a para-cervical block, is to ensure that the patient is medically capable of undergoing the procedure." Put differently, the trial judge found that the standard of care "for a physician choosing to perform an in-office hysteroscopy on a patient with uncontrolled co-morbidities requires that the physician have appropriate life-saving equipment on hand in the event the patient codes."

Dr. Bryan, however, points to the trial testimony by Dr. Felton Winfield, a medical review panel member who changed his opinion regarding the applicable standard of care after he signed the medical review panel opinion. At trial, Dr. |₁₃Winfield testified that while he had initially signed the medical review panel opinion which concluded that Dr. Bryan violated the applicable standard of care, he has since modified his opinions. Specifically, Dr. Winfield testified that after he signed the panel opinion, he discovered via scientific literature that hysteroscopies are safer when performed in-office. Moreover, he testified that, in his opinion, the applicable standard of care holds that a patient with high blood pressure, post-menopausal bleeding, and obesity is an acceptable candidate for an in-office hysteroscopy.

Dr. Bryan, however, does not argue that the opinions on the standard of care put forward by Drs. Guette and Hogan are unreasonable or medically impermissible. Rather, he asserts that Dr. Winfield's testimony better encapsulates the national standard of care. The trial judge, accordingly, was presented with several competing views on the applicable standard of care. A factfinder (whether judge or jury),

is typically largely dependent upon the testimony of expert witnesses to establish the specialized standard of care. See La. C.E. art. 702; McCarter, 09–1508, p. 4, 44 So.3d at 347; Serigne v. Ivker, 00–0758, pp. 5–6 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787–788 ("Expert testimony of professionals in the field is necessary to help the court determine what the standard was at the time in question and whether there has been a breach."). Expert witnesses often disagree as to the standard of care applicable to a case. When such a disagreement occurs, the factfinder's determinations are given a great deal of deference. McCarter, 09–1508, p. 4, 44 So.3d at 347, citing Serigne, 00–0758, p. 6, 808 So.|₁₄2d at 788. Similarly, when the factfinder is presented with two permissible views of the evidence, its choice between them cannot be manifestly erroneous. See Montz, 16–0145, p. 2, 188 So.3d at 1051. We, having reviewed the record, cannot say that the trial judge's decision to credit the testimony of Drs. Guette and Hogan over that of Dr. Winfield in ascertaining the applicable standard of care was manifestly erroneous or unreasonable.[6]

**B**

Next, we address Dr. Bryan's assertion that the judgment must be reversed because the plaintiffs failed to prove that Dr. Bryan's performance of an in-office hysteroscopy on Ms. Reynolds was the cause-in-fact of her cardiac arrest and eventual death. He argues that because the plaintiffs did not prove that his actions caused their mother's cardiac arrest, they necessarily failed to prove the cause-in-fact element of the medical malpractice cause of action. The plaintiffs de-

6. It does not appear from our reading of Dr. Bryan's memorandum in support of his appeal that he argues that the judgment should be reversed because the plaintiffs failed to prove that he violated the applicable standard of care. Nevertheless, we have reviewed the record on this issue and conclude that the trial judge's finding on this point is supported by competent evidence, is not unreasonable, and is not clearly wrong.

mur, noting correctly that Dr. Bryan was not found liable by the trial judge for causing Ms. Reynolds' cardiac arrest. Rather, Dr. Bryan was found liable for performing the hysteroscopy on a patient with Ms. Reynolds' co-morbidities in his office when he did not have the requisite life-saving equipment—specifically intubation equipment—on hand in the event the patient aspirated her stomach contents during the procedure. The plaintiffs, additionally, argue that they introduced sufficient evidence to substantiate the trial judge's conclusion that Dr. Bryan's breach of the standard of care was a cause-in-fact of their mother's death.

In a medical malpractice action, the plaintiff must establish a causal connection between the defendant's negligent treatment and the sustained injury. See Hubbard v. State, 02–1654, 02–2355, p. 10 (La.App. 4 Cir. 8/13/03), 852 So.2d 1097, 1103. Cause-in-fact is usually a "but for" inquiry which tests whether the injury would not have occurred but for the defendant's negligence. See Hubbard, 02–1654, 02–2355, p. 10, 852 So.2d at 1103. Causation is also a factual determination that should not be reversed on appeal absent manifest error. See Hubbard, 02–1654, 02–2355, pp. 10–11, 852 So.2d at 1103, citing Tucker v. Lain, 98–2273, 01–0608, 01–0609, p. 14 (La. App. 4 Cir. 9/5/01), 798 So.2d 1041.

Here, the trial court's cause-in-fact conclusion is based upon the testimony of two medical review panel members—Drs. Guette and Hogan—and Dr. Craig Ehrensing, Ms. Reynolds treating physician at Ochsner. Drs. Guette and Hogan testified that, in their respective opinions, Dr. Bryan committed an additional breach of the standard of care when he performed the hysteroscopy upon Ms. Reynolds with the knowledge that she had eaten prior to the procedure. Dr. Guette indicated that performing this procedure—which necessitated anesthesia—after Ms. Reynolds had eaten several times already that day, increased the chance that she would aspirate her stomach contents during the procedure. Drs. Hogan and Guette also testified that had Dr. Bryan performed the procedure in a hospital, anesthesia and resuscitative personnel would have been on standby in the event Ms. Reynolds coded. In this case, Dr. Hogan testified that Parish Anesthesia's resuscitative team's records indicate that it was contacted by Dr. Bryan's office at approximately 1:30 PM, subsequently discovered that Ms. Reynolds had aspirated stomach contents into her lungs, but was unable to intubate her until 1:39 PM.[7] Accordingly, Drs. Guette and Hogan testified that, had Ms. Reynolds' procedure taken place in a hospital, there would have been no delay between the time her pulse and breathing stopped

7. Dr. Bryan, we note, also argues that the trial judge was clearly wrong in his reading of Parish Anesthesia's records. Dr. Bryan testified that that he called Parish Anesthesia, which is located nearby his office, after he discovered that Ms. Reynolds had suffered a cardiac arrest and asked that a resuscitation team be sent to his office. Based upon Parish Anesthesia's records, the trial judge concluded that it was contacted by Dr. Bryan at approximately 1:30 PM and arrived at 1:39 PM, leaving a nine-minute gap in which Ms. Reynolds received no oxygen. The trial court's conclusion on this point is based upon testimony given by Dr. Hogan. Dr. Bryan, however, interpreted the document differently, reading it to indicate that Parish Anesthesia arrived at his office at 1:30, nine minutes earlier than concluded by the trial judge. This assignment of error, accordingly, presents a clear issue of fact that the trial judge was called upon to resolve. He was faced with two reasonable views of the evidence and, having reviewed the record, we cannot say that that the trial judge's decision to credit Dr. Hogan's interpretation of the Parish Anesthesia records over Dr. Bryan's to be manifestly erroneous or clearly wrong. See Montz, 16–0145, p. 2, 188 So.3d at 1051.

and the time resuscitative efforts would have commenced.

In other words, Drs. Guette and Hogan opined that had Ms. Reynolds been resuscitated sooner, she would not have suffered a brain injury. Had she not suffered a brain injury, she would not have needed a tracheotomy tube or admittance into a long-term acute care facility. According to Drs. Guette and Hogan, therefore, Dr. Bryan's breaches of the standard of care—performing the procedure on a patient with Ms. Reynolds' co-morbidities and with the knowledge that she had eaten prior to the procedure—ultimately led to Ms. Reynolds' death.

Dr. Ehrensing, Ms. Reynolds' treating physician at Ochsner, testified that she suffered a respiratory arrest and aspirated her stomach contents into her lungs in Dr. Bryan's office. This would not have happened, he opined, had she not eaten prior to the procedure. The aspirated stomach contents, he testified, blocked Ms. Reynolds' airways and resulted in acute respiratory acidosis, or oxygen loss. He supported his opinion by reference to Ms. Reynolds' written medical records and x-rays. The oxygen loss brought about by the aspirated stomach contents, he thus noted, more likely than not caused her to suffer from anoxic hypoxic encephalopathy[8] and aspirational pneumonia, all of which led to irreversible brain damage. Dr. Ehrensing also testified that Ms. Reynolds' tracheotomy tube was necessitated by the oxygen loss and resultant brain damage. And he testified that, in his opinion, Ms. Reynolds' need to be placed in a long-term acute care facility was brought about by the oxygen loss suffered in Dr. Bryan's office. Having

reviewed the record, we cannot say that the trial judge's conclusion that Dr. Bryan's breach of the standard of care was a cause-in-fact of Ms. Reynolds' death, or his decision to credit the testimonies of Drs. Ehrensing, Guette, and Hogan in reaching this conclusion, is manifestly erroneous or unreasonable.

## C

Dr. Bryan next argues in his final assignment of error that the trial judge's finding that he failed to obtain informed consent from Ms. Reynolds before undertaking the hysteroscopy is manifestly erroneous and must be reversed. We, however, pretermit discussion of this assignment of error because a finding that it was clearly wrong would have no effect on the underlying judgment. In this case, the trial judge concluded that Dr. Bryan's actions fell below the applicable standard of care, and that they were a cause-in-fact of Ms. Reynolds' death. He also concluded that Dr. Bryan was, independent of this breach, also liable for failing to obtain informed consent from Ms. Reynolds. Louisiana's Medical Malpractice Act[9] and Uniform Consent Law[10] impose two statutory duties upon physicians and create two different theories for establishing malpractice liability against a physician. See *Gunter v. Plauche*, 439 So.2d 437, 440 (La. 1983); *McGrew v. Waguespack*, 14–0251, p. 8 (La. App. 1 Cir. 12/30/14), 168 So.3d 690, 695. If we were to reverse the trial judge's informed consent ruling, therefore, Dr. Bryan would still be liable to the plaintiffs because we affirm the trial judge's conclusion that they established his liability in accordance with the Medical Malpractice

---

8. Dr. Hogan testified that "anoxic hypoxic encephalopathy" is the medical term for brain injury resulting from a lack of oxygen.

9. See La. R.S. 9:2794 and La. R.S. 40:1231.1, et seq.

10. At the time of Ms. Reynolds' procedure, Louisiana's Uniform Consent Law was found in La. R.S. 40:1299.40 E. The substance of that provision, however, can now be found at La. R.S. 40:1157.1.

Act. Reversing the trial judge on this point, accordingly, would have no effect on the underlying money judgment. We, accordingly, pretermit examination of this assignment of error.

### DECREE

The trial court's December 23, 2015 judgment in favor of Rose Minor, Kimbal Minor, Robert Reynolds, and Taurean Reynolds and against Dr. Washington Bryan is affirmed.

**AFFIRMED**