JjLEON A. CANNIZZARO, JR., Judge.
This case involves a medical malpractice action brought by the children of Marcia Becker Cochran, who died during a procedure that was being performed by the defendant, Dr. Saroj Tampira.[1] A jury found that the plaintiffs failed to prove the standard of care required to be exercised by Dr. Tampira, and judgment was granted in favor of Dr. Tampira. The plaintiffs are now appealing that judgment.
FACTS AND PROCEDURAL HISTORY
The Angioplasty Procedure
Ms. Cochran underwent a peripheral angioplasty[2] that was performed by Dr. | ¡¿Tampira. During the procedure, one of Ms. Cochran’s arteries was perforated, and she died.
Dr. Tampira had been treating Ms. Cochran for almost two years. When he began treating her, he found that she had several medical problems, including coronary heart disease, angina pectoris[3], and peripheral vascular disease[4]. Approximately five months before the angioplasty in question, Dr. Tampira had performed a successful angioplasty on Ms. Cochran. At the time of the first angioplasty, he had found that Ms. Cochran had no palpable pulse in her legs. Ms. Cochran also experienced pain in her legs when she walked. An angiogram revealed severe disease of both legs primarily involving the external iliac arteries.[5] Dr. Tampira performed a *1159 successful angioplasty which increased the blood flow to Ms. Cochran’s legs and feet.
Ms. Cochran’s problems with her arteries returned, however. The blood vessels that had been treated in the earlier angioplasty had restenosed.[6] Dr. Tampira testified that he discussed with Ms. Cochran the medical options available for treating the restenosis. Ms. Cochran decided to undergo another angioplasty, which was one of the treatment options for her condition.
Is At the beginning of the second angioplasty procedure, Ms. Cochran was given medication to help her relax. Although her blood pressure was low at this point, Dr. Tampira found that she was stable based on her appearance and her other vital signs. He then proceeded with the angioplasty procedure. Before beginning the procedure, Dr. Tampira had to determine the appropriate-balloon size to , use. If the balloon used in an angioplasty is too large, there is a risk that the artery will rupture. Dr. Tampira injected dye into Ms. Cochran’s arteries so that he could see the size of her arteries. Using his experience in determining artery size, he “eyeballed” Ms. Cochran’s arteries and decided that her arteries could accommodate an 8 millimeter balloon. He had used,a 6 millimeter balloon in the - earlier procedure, and he thought that it would be appropriate to use a slightly larger balloon in the second procedure.
Dr. Tampira performed an angiogram that showed that both of Ms. Cochran’s external iliac arteries were blocked. He then proceeded to perform balloon angioplasty on both external iliac arteries. He inserted a stent into the left external iliac artery, and he then began working with the right external iliac artery.
According to the medical records of the angioplasty, at 10:06- a.m. Dr. Tampira inserted a 6. millimeter balloon, into Ms. Cochran’s right external iliac artery. The balloon was deflated at 10:09 a.m., and it was reinflated at 10:11 ,a.m. The balloon was deflated again at 10:14 a.m., and at 10:18 a.m. an 8 millimeter stent was inserted. At this time a 6 millimeter balloon was reinserted. At 10:29 a.m. the 6 millimeter balloon was withdrawn. At 10:82 a.m. Dr. Tampira inserted |4two 7 millimeter balloons,- both of which were withdrawn, because they ruptured. At 10:36 a,m. Dr. Tampira inserted an 8 millimeter balloon, which was inflated in the stent, and he then deflated the balloon. At this point, the nurse informed Dr. Tampira that Ms. Cochran’s blood pressure was dropping. Also, at 10:86 a.m. Ms. Cochran “crashed”[7] and was not breathing. A code[8] team[9] was called, and an emergency room physician[10] was called. Dr. Tampira and the emergency room physician intu-bated [11] Ms. Cochran, and then Dr. Tampi- *1160 ra performed cardiopulmonary resuscitation or CPR[12] on her. When the code team arrived, they began performing CPR.
According to the medical records, at 10:45 a.m. Dr. Tampira injected dye into Ms. Cochran’s blood vessels in an attempt to determine whether an artery had been perforated. Dr. Tampira suspected that an artery perforation had led to Ms. Cochran’s crash. Although he examined the right and left common and external iliac arteries and the lower end of the aorta, he was unable to find a perforation. The medical records also show that at 11:11 a.m. a fluid used in the resuscitation effort was administered to Ms. Cochran. Finally, at 11:21 a.m., Ms. Cochran was | ñgiven a pacemaker[13] in a final effort to revive her. The code team continued to give CPR to Ms. Cochran until approximately noon, but Ms. Cochran could not be revived. She was then pronounced dead. An autopsy done on Ms. Cochran’s body showed that she died due to a perforation-of her right common iliac artery.[14]
Had Dr. Tampira been able to locate the perforation soon enough, he could have performed a balloon tamponade[15] procedure that could have slowed or stopped the blood loss so that the perforation could have been surgically repaired. Dr. Tampi-ra did not locate the perforation, however, so a balloon tamponade could not be performed.
Medical Review Panel
Prior to filing suit against Dr. Tampira, Ms. Cochran’s four adult children filed a request for a review of their claim against Dr. Tampira by a medical review panel pursuant to La. R.S. 40:1299.47. Filing a request for a review of a medical malpractice claim prior to filing suit on that claim is required by the Louisiana Medical Malpractice Act. La. R.S. 40:1299.41 et seq. The medical review panel that considered the claims against Dr. Tampira consisted of three cardiologists and a lawyer. The medical review panel issued an opinion finding that the evidence before the panel did not support the conclusion that the Chalmette Medical Center or Dr. Tampira failed to meet the applicable standard of care in treating Ms. Cochran. The reasons given for the opinion stated that “[p]rior to the time the Impatient suffered cardiac arrest, there was no clear x-ray evidence of the ruptured artery” and that “[ajfter the patient’s demise the rupture was visualized by x-ray but not recognized.” ‘ '
Physician Testimony
At the trial five physicians testified. Three of those physicians were members of the medical review panel that had reviewed the claim brought by Ms. Cochran’s children, and Dr. Tampira also testified. The final physician who testified was a radiologist who performed angioplasties.

Dr. Tampira

Dr. Tampira, who was a board certified interventional cardiologist,[16] was the first *1161 physician to testify at trial. He testified that when Ms. Cochran saw him prior to the first angioplasty he performed on her, she stated that she had increasing leg pain that was quite severe when she walked across a room. Dr. Tampira ordered an angiogram, which is an imaging procedure performed by a radiologist that allows blood vessels to be visualized. The angio-gram showed that Ms. Cochran had severe vascular disease in both of her legs, mainly involving the iliac arteries. To treat Ms. Cochran’s leg pains, Dr Tampira performed the first of two angioplasties on Ms. Cochran. The first angioplasty was successful.
Dr. Tampira explained to the jury the procedure that is followed in conducting an angioplasty. He said that during an angioplasty an accurate record of the events that occur is made, usually by a nurse or a technician. He cautioned, |7however, that “I would point out that the time line might not be accurate.” He further testified that it is important to use the correct size balloon in an angioplasty to avoid perforating an artery. He said that he visualizes the size of the artery involved and uses his experience to determine what balloon size should be used. He further testified that the largest balloon size he used on Ms. Cochran in the first angioplasty he performed was 6 millimeters and that he thought that size balloon was undersized.
When Dr. Tampira acknowledged that at the end of the first angioplasty, Ms. Cochran’s blood pressure was high, he was asked whether the high blood pressure reading led him to terminate the procedure. Dr. Tampira said that it did not. Dr. Tampira was also asked whether inflating the balloon in an angioplasty causes pain, and he said that it does but that the amount of pain is not necessarily increased the more an artery is stretched.
Dr. Tampira was asked why a second angioplasty was done on Ms. Cochran, and he explained that the same blood vessels involved in the earlier procedure had restenosed and needed to be reopened. Although Dr. Tampira admitted that the consent form for the second angioplasty procedure did not have the alternative treatments that could be used to remedy her restenosis, he testified that he had, in fact, discussed with Ms. Cochran that there were three alternatives to be considered, namely, surgery, angioplasty, and medication. ■ Because Ms. Cochran needed to work to support herself, she was not a good candidate for treatment with medication, because she would have to stop working if she continued to have leg pain. There were certain complicating factors to consider with respect to the surgical treatment option. Because Ms. Cochran would have to be placed on blood |sthinners after surgery, there was a risk that she would have bleeding from a peptic ulcer that she had. Additionally, Ms. Cochran had suffered complications with an earlier heart operation. Therefore, after Dr. Tampira discussed all of the treatment options with Ms. Cochran, she chose to undergo a second angioplasty.
Dr. Tampira also testified that although it is not the standard of care to inject dye after each balloon is inserted to visualize the patient’s arteries in an angioplasty, he does so. He said that it is necessary to use a dye to visualize blood vessels on a fluoroscope. Because blood vessels themselves are not visible on an x-ray and the dye is, blood vessels in which the dye has been injected can be seen.
Dr. Tampira explained that three types of images were used in connection with the angioplasty he performed on Ms. Cochran. First, there was a fluoroscope which created real time images as the procedure was being done. These images were not recorded on the fluoroscope, however. Thus, the images seen on the fluoroscope could *1162 only be visualized at the time the image was being made. Another piece of equipment,- an Eigan, was used to record the images that Dr. Tampira could see on the fluoroscope. The Eigan images were like a videotape of the images seen on the fluoroscope as the procedure was being done. Dr. Tampira could view the stored images on the Eigan during the procedure. A third piece of equipment was used to produce cineangiogram images. These images were selected -images that Dr. Tampi-ra wanted to memorialize, and still photographic images could be made from the cineangiogram. The cineangiogram images were not available to Dr. Tampira during Ms. Cochran’s angioplasty. Ci-neangiogram images are developed after an angioplasty has been completed. Although a cineangiogram image is much clearer than an image seen on the Eigan, the Eigan jgimages were the only stored images that were available to Dr. Tampira during the procedure done on Ms. Cochran.
Dr. Tampira testified that as soon as Ms. Cochran crashed, he thought that the crash was caused either by a ruptured blood vessel or a cardiac arrest caused by a problem with her coronary arteries. Although Dr. Tampira wanted to perform an angiogram immediately, he did not do so, because Ms. Cochran had stopped breathing. He testified that when a patient ceases to breath, an airway must be opened at once. Also, when a patient is not breathing and the heart has stopped, as was the ease with Ms. Cochran, the second priority after opening an airway is compressing the patient’s chest to restore circulation. Therefore, he began CPE- as soon as an airway was open.
Dr. Tampira was asked “would you agree with the statement that if a physician such as yourself perforates an artery, that the standard of care is to diagnose the perforation?” His answer was yes. When he was asked how a physician diagnoses a perforation, he said that “[w]e do an angio-gram or cine or put the dye into the blood vessels to look at the perforation.” Dr. Tampira then stated that he followed that procedure in Ms. Cochran’s case. Dr. Tampira said that the most important thing to do when a patient sustains a perforation is to locate the perforation. Additionally, he said that it is important to give “a lot of fluids” to the patient to expand blood vessels that have collapsed. Dr. Tampira also stressed that it is very important to use chest compressions to resuscitate the patient. Dr. Tampira admitted that he could not find the perforation and that as a result Ms. Cochran bled to death.
|inDr. Castenada
After Dr. Tampira testified, Wilfredo R. Castenada, M.D., a radiologist, testified at trial on behalf of the plaintiffs. Dr. Castenada testified that he practiced a subspecialty of radiology called interven-tional radiology, and he said that in his subspecialty he performs angioplasties and places stents in patients. Dr. Castena-da was qualified as an expert in interven-tional radiology, and he testified that the standard of care in doing angioplasties is the same for interventional radiologists and interventional cardiologists. Dr. Castenada had been involved in approximately 1,500 angioplasties and had never had a patient die during one of these procedures.
Dr. Castenada testified that he had reviewed the medical records of Ms. Cochran’s angioplasty, her autopsy report, the cineangiogram from her angioplasty, and the depositions of the physicians who were members of the medical review panel for her case. In Dr. Castenada’s expert opinion the standard of care in Ms. Cochran’s case required Dr. Tampira to list on the consent form that she signed for the angio *1163 plasty the alternative treatments that were available for her condition, and this was not done. Dr. Castenada was also of the opinion that Dr. Tampira’s method of determining what size balloon to use for Ms. Cochran’s angioplasty did not meet the applicable standard of care. Dr. Castena-da testified that the proper way to calculate the proper size of balloon to use was by actually measuring the artery with an electronic caliper on an x-ray, which could not be done by Dr. Tampira using the cineangiogram and the other equipment he was using. Dr. Castenada further stated that the standard of care applicable to angioplasty procedures requires the physician or an assistant to document the artery measurement in the medical records.
InDr. Castenada demonstrated to the jury the procedure performed on Ms. Cochran by Dr. Tampira. In doing so, he noted several deviations from the applicable standard of care. Dr. Castenada believed that the balloon that was inflated in Ms. Cochran’s artery was too large for the artery. He also thought that Dr. Tampira should have immediately injected dye into Ms. Cochran’s artery when her blood pressure began dropping to determine whether there was a rupture in an artery. Dr. Tampira could have then inflated a balloon in the artery to tamponade the hole. He also stressed that Dr. Tampira did not give fluids to Ms. Cochran soon enough after her blood pressure dropped. It was also Dr. Castenada’s opinion that because Ms. Cochran’s blood pressure had risen substantially during the procedure, Dr. Tam-pira should not have proceeded with the angioplasty until her blood pressure was under control.
Dr. Castenada testified that rather than doing CPR immediately after Ms. Cochran crashed, Dr. Tampira should have been looking for a ruptured artery while others performed CPR. In Dr. Castenada’s opinion, the standard of care applicable to Dr. Tampira required him not to just attempt to locate the perforated artery, he was required to, in fact, locate it.
In summary, Dr. Castenada testified regarding the standard of care that was applicable to the procedure performed by Dr. Tampira on Ms. Cochran. First, the arteries into which any balloon was inserted should have been measured so that a balloon that was too large would not be used. Second, Ms. Cochran’s vital signs as well as any visual signs of potential bleeding should have been monitored. Third, when Ms. Cochran’s blood pressure reached the level that it. did prior to her crash, the cause of the rise in blood pressure should have been determined. Fourth, when lii>the bleeding occurred, it should have been diagnosed and treated in a timely manner. Thus, Dr. Tampira should have immediately injected dye into Ms. Cochran’s arteries to find the source of the bleeding. Finally, he should have begun the administration of fluids promptly.

Dr. St. Martin

Maurice Edward St. Martin, M.D., who was one of the three physician members of the medical review panel that considered Ms. Cochran’s case, also testified at the trial. Dr. St. Martin was qualified as an expert in interventional- cardiology. He testified that prior to the time that Ms. Cochran suffered cardiac arrest, there was no clear x-ray evidence of bleeding or a ruptured artery. That was the reason that the medical review panel found that Dr. Tampira had not violated the applicable standard of care when he failed to locate the ruptured artery. Dr. St. Martin also stated that there was no reliable way to measure an artery and that assessing the size of an artery is “just something you get used to as you do a lot of them [angioplasties].” He also stated that it is not standard procedure for an interventional car *1164 diologist to write the artery measurements in the medical record.
Dr. St. Martin further testified regarding the times listed on the medical records for the angioplasty. He stated that “[u]sually times that are on the records like this are pretty imprecise.” Additionally, he said that “when things start to happen urgently, a lot of these things get filled in a few minutes later retrospectively because the people who are going to write them down are actually busy taking care of an emergency.” In a case involving a cardiac arrest, Dr. St. Martin opined that the most immediate concerns are to provide an airway for oxygen and to resuscitate the heart.
|13Pr. St. Martin and another member of the medical review panel, Frederick Kush-ner, M.D., reviewed the images displayed on the Eigan machine used by Dr. Tampi-ra. Dr. St. Martin stated that “Dr. Kush-ner and I played it back again and again ... and knowing that there had béen a ruptured artery and knowing from the autopsy, the whole proceedings and knowing from the autopsy about where it was, we were able — -with some persistence, I have to say, playing it back again and again to see — I think one or two frames where we said, okay, that’s the spot where it ruptured.” Dr. St. Martin further testified that it was his opinion based on all of the information that he had been provided that Dr. Tampira did not deviate from the applicable standard of care in performing the angioplasty on Ms. Cochran and in trying to locate the source of her bleeding during the procedure. Additionally, Dr. St. Martin said that he did not think the applicable standard of care required Dr. Tampira to diagnose the perforation in Ms. Cochran’s artery.

Dr. Ramee

Stephen Ramee, M.D., another physician who was on the medical review panel for Ms. Cochran’s case, testified at the trial. He was qualified as an expert in interven-tional cardiology. Dr. Ramee opined that Dr. Tampira did not deviate from the applicable standard of care in his treatment of Ms Cochran. Dr. Ramee also said that the standard of care does not require the size of a patient’s arteries to be written in the medical records of an angioplasty procedure. He further stated that during a routine procedure with no complications and adequate staffing, the medical records of the procedure are basically accurate. However, he also said that “[a]s soon as you have something untoward happening, as soon as the person keeping the record has to run and get a different catheter balloon or the patient has | ua problem and it’s sort of all hands on deck to take care of the patient, then the record will not be representative, at least in a time sequence of what happened.”
Dr. Ramee also testified that when a patient is not breathing, the order of priority for a physician is to first assure that the patient has an airway for breathing and then to make sure the patient’s blood pressure is at an acceptable level to make sure that the patient is getting blood to the brain and the vital organs, and then chest compressions should be started. Dr. Ra-mee opined that these things should be done before undertaking to locate a perforation in an artery. Dr. Ramee did not think that Dr. Tampira failed to meet the applicable standard of care in treating Ms. Cochran after she “crashed.”
With respect to whether Dr. Tampira improperly delayed the administration of fluids after Ms. Cochran crashed, Dr. Ra-mee said that he could not rely on the medical records being an accurate representation of what occurred after a code had been called. He said that “I know the cath lab records are wrong during a Code,” because “it’s just impossible to sit there and type when you’re trying to re- *1165 suscítate a patient.” Dr. Ramee said that he would be “amazed” if Dr. Tampira had waited as long as the records reflected to begin administering fluids. Dr. Ramee said that he had been in situations where patients went into cardiac arrest “multiple times” and that “[i]t’s very chaotic.”

Dr. Kushner

The final expert witness at the trial was Fredrick Kushner, M.D., who testified by videotape at the trial. Dr. Kushner was a member of the medical review panel with Drs. St. Martin and Ramee, and he was qualified at trial as an expert in 11Binterventional cardiology. When questioned regarding the sequence of events recorded in the medical records for Ms. Cochran’s angioplasty procedure, he stated at different times that he was “very skeptical” and “highly skeptical” regarding the sequence and timing of the events recorded after Ms. Cochran crashed. He testified that there is “pandemonium” when a code is called. He stated that the time is a “rush, emergent, highly anxious moment” and that everyone involved is doing everything to try to save the patient’s life. Therefore, he gave little credence to the accuracy of the medical records after Ms. Cochran’s crash.
Dr. Kushner also testified that the bleeding from Ms. Cochran’s perforated artery could be seen on the cineangiogram but that the image he viewed was not available to Dr. Tampira until after Ms. Cochran had died. Dr. Kushner also stated that in his expert opinion Dr. Tampira followed the applicable standard of care in treating Ms. Cochran and that Dr. Tampi-ra was not negligent in his treatment of Ms. Cochran.

Additional Testimony by Dr. Tampira

After the other physicians had completed their testimony, Dr. Tampira was called back to the witness stand to testify on behalf of the defense. Dr. Tampira specifically testified that he had tried the method that Dr. Castenada used for determining artery size and that it did not work well. Dr. Tampira also demonstrated to the jury how he believed that Dr. Castena-da’s method was flawed. Additionally, Dr. Tampira disputed Dr. Castenada’s testimony that Ms. Cochran’s right external iliac artery was not completely blocked. Using the images from the cineangiogram, Dr. Tampira explained to the jury the procedure he followed in the angioplasty that he performed on Ms. Cochran.
hfiEven though the medical records reflected that fluids were not given to Ms. Cochran until well after the time she Crashed, Dr. Tampira stated that “[ajctually, it was given right at the time she crashed.” Dr. Tampira also explained that patients usually do not go into cardiac arrest when there is a perforation of an artery in an angioplasty. He said that Ms. Cochran’s situation was very uncommon in that she suddenly stopped breathing and went into cardiac arrest. He further testified that the first thing that had to be done when Ms. Cochran stopped breathing was to open an airway and give her oxygen. He testified that when Ms. Cochran went into cardiac arrest that “I was frantic and tried to do everything — everything possible.” He also -said that “[ejverybody run around like crazy.’ ”
Dr. Tampira agreed that Ms. Cochran died' from the bleeding from the artery that was perforated. He also agreed that the treatment received by Ms. Cochran would not stop the bleeding. Finally, when Dr. Tampira was asked whether the standard of care for an interventional cardiologist who causes a perforation is to diagnose the perforation and whether the standard of care required that immediate steps be taken to repair the perforation, Dr. Tampira replied, “Yes.” When he originally testified, however, Dr. Tampira was specifically asked, “What is the standard of *1166 care for an interventional cardiologist who perforates an artery?” Dr. Tampira then testified that the standard of care was “[t]ry to find the location of perforation and then put a balloon in to inflate it, to that — the spot that had the leakage, to stop the leakage.” Thus, when Dr. Tampi-ra enunciated the standard of care in his own words, he qualified the requirement for finding the perforation by the use of the word “try”.
117M& Cochran’s Children
The plaintiffs in this case are Ms. Cochran’s adult children, who are suing on their own behalf and on behalf of their mother for her pain and suffering prior to her death. Each of Ms. Cochran’s children testified that they were very close to their mother and that her death had a profound effect on their lives. They described how deeply affected they were by seeing their mother’s body shortly after her death. All of the testimony regarding the children’s relationship with their mother reflects that her death was a devastating event for each of them.
DISCUSSION '
Assignment of Error
Ms. Cochran’s adult children have filed an appeal asserting a single assignment of error. They claim that the trial court erred in finding that they did not prove the applicable standard of care that Dr. Tampira was required to meet. The plaintiffs contend that the applicable standard of care required Dr. Tampira to correctly diagnose the perforated artery suffered by Ms. Cochran, to treat the perforation with a balloon tamponade timely, to stop the bleeding from the perforated artery, and to administer fluid replacement therapy.
Applicable Standard of Review
In Rosell v. ESCO, 549 So.2d 840 (La.1989), the Louisiana Supreme Court discussed the scope of the appellate court’s review of a trial court’s findings of fact as follows:
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable | ^inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong....
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
Id. at 844. See also Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Harvey v. Cole, 2000-1849 (La.App. 4 Cir. 1/23/02), 808 So.2d 771.
The proper standard of review where the appeals court finds that manifest error has been committed by the factfinder was stated in the Rosell case as follows:
[W]hen the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits.
549 So.2d at 844, n. 2. See also Dolese v. Transit Management of Southeast Louisiana, Inc., 2003-1670, p. 8 (La.App. 4 Cir. 7/28/04), 881 So.2d 746, 751, writs denied, *1167 2004-2752, 2004-2675 (La.1/7/05), 891 So.2d 688, 693.
Jury’s Finding of Facts
The first interrogatory asked of the jury was “[d]id the plaintiffs prove by the preponderance of the evidence the applicable standard of care for the angioplasty surgical procedure performed on Mrs. Cochran on September 23rd, |1fl1996.” The jury answered this interrogatory in the negative. The plaintiffs argue that this finding of fact by the jury was clearly wrong and manifestly erroneous.
Because the record is replete with the testimony of five physicians, including the defendant, Dr. Tampira, regarding the standard of care for the treatment of Ms. Cochran by Dr. Tampira, we are puzzled by the jury’s answer to the interrogatory. Did the jury find that the evidence regarding the standard of care was simply not proven, or did the jury, in fact, find Dr. Tampira’s treatment of Ms. Cochran did not fall below that standard?
There was clearly ample evidence presented at trial regarding the applicable standard of care. The expert witnesses in interventional cardiology who testified on behalf of Dr. Tampira made it clear that the applicable standard of care in Ms. Cochran’s case was to try to find the perforation that caused the bleeding, and their testimony reflected that it would have been extremely difficult, if not impossible, for Dr. Tampira to have located the source of the bleeding using the equipment he had available to him at the time that the bleeding was occurring.
Alternatively, Dr. Castenada, an expert witness in interventional radiology who testified on behalf of the plaintiffs, testified that there were a number of deviations from the applicable standard of care in Dr. Tampira’s treatment of Ms. Cochran. Dr. Castenada found problems with the technique Dr. Tampira used to determine the proper balloon size to use in the angioplasty, problems with the timing of the injection of dye into Ms. Cochran’s arteries to try to locate the perforation and the administration of fluids, and problems with Dr. Tampira’s inability to locate the perforation. He also testified that instead of Dr. Tampira opening an airway and giving Ms. Cochran CPR while waiting for the code team toj^arrive, Dr. Tampira should have relied on other personnel working with him at the time to do these things while Dr. Tampira immediately began injecting the dye into Ms. Cochran’s arteries to find the source of the bleeding.
The crux of the plaintiffs’ argument is that Dr. Tampira was required under the applicable standard of care to, in fact, find the perforation, not just to try to find the perforation. Dr. Tampira did answer yes to a leading question asking whether the applicable standard of care was to “diagnose the perforation.” We note, however, that when Dr. Tampira was explaining the standard of care in his own words, he stated that the standard was to try to find the perforation. All of the other physicians who testified on behalf of Dr. Tampi-ra agreed that the standard of care required Dr. Tampira to attempt to find the perforation, not to, in fact, find it.
Based on clear evidence regarding the standard of care owed to Ms. Cochran by Dr. Tampira, we must conclude that the jury’s finding that the plaintiffs failed to prove the standard of care is erroneous. The great weight of the evidence presented at trial showed that Dr. Tampira was required to try to find the perforation, if he could, but that with the equipment he was using, he would not have been able to do so at the time Ms. Cochran was bleeding.
In a situation such as the one presented in this case, it is unrealistic to require a physician to diagnose and correct any complicated problem that may arise *1168 during a complex medical procedure. Requiring perfection in such a situation would require a physician to meet an impossible standard in many cases where the physician had rendered appropriate medical care under the circumstances. Therefore, Dr. Tampira was required to use the skill used by other interventional cardiologists to attempt to locate the perforation in Ms. | ?A Cochran’s artery and, if the perforation were found, to use the same skill that those other interventional cardiologists would have used to correct the problem.
In light of our conclusion that the jury’s finding of fact regarding the proof of the applicable standard of care was clearly wrong or manifestly erroneous, we have conducted a de novo review of the evidence. Based on our de novo review, we find that the applicable standard of care was proven by the plaintiffs but that Dr. Tampira’s treatment of Ms. Cochran did not fall below that standard. Therefore, the result reached by the jury and the result we reached after a de novo review as to the liability of Dr. Tampira are the same. Although Ms. Cochran’s death was tragic and the effect on her children was devastating, her death was not due to the fault of Dr. Tampira.
CONCLUSION
We find that Ms. Cochran’s death was not a result of Dr. Tampira’s failure to meet the applicable standard of care in treating Ms. Cochran. The judgment of the trial court is affirmed.
AFFIRMED.

. The lawsuit was also filed against Dr. Tam-pira’s medical corporation, his insurer, and Universal Health Services, Inc. d/b/a Chal-mette Medical Center, Inc. Chalmette Medical Center was no longer a party to the suit at the time of the trial.

. Angioplasty is a treatment for clogged or blocked arteries. An artery can become clogged or blocked when fatty plaques are deposited on the walls of the artery causing a narrowing of the artery that impedes blood flow. Peripheral angioplasty is a form of angioplasty that is used to treat clogged or blocked arteries in areas of the body other than the heart. In Ms. Cochran’s situation, there was a blockage in the right and left external iliac arteries, which furnish blood to the legs. To remedy the narrowing of the arteries, Dr. Tampira was attempting to open the arteries to improve the blood flow. He began by inserting a guidewire into an artery in Ms. Cochran’s groin so that he could determine where the narrowed arteries were located. When he located an area of blockage, he inserted a thin tube, or catheter, the tip of which was covered by an uninflated balloon, into the artery. Had the procedure on Ms. Cochran been completed as expected, the plaque deposited on the artery walls would have been compressed by inflating and deflating the balloon to open the arteries, and stents, small metal mesh tubes, that had been inserted into the arteries would have held the arteries in place after the balloons were removed. During the angioplasty Dr. Tampira monitored the path of the guidewire and the area where the arteries were narrowed by using a fluoroscope to provide x-ray images of Ms. Cochran’s arteries when dye was injected into them.

. Angina pectoris is the chest discomfort that occurs when the oxygen supply to an area of the heart muscle is insufficient. In most cases the lack of oxygen, which is carried in the blood, is due to a decrease in the blood supply resulting from a narrowing of the arteries that supply the heart.

. Peripheral vascular disease refers to disease of blood vessels outside of the heart and the brain that often results from a narrowing of the blood vessels that carry blood to the legs, arms, stomach, or kidneys.

. The abdominal aorta, which is the main artery from the heart, descends down the abdomen and bifurcates into the right and left common iliac arteries, which then branch into external and internal iliac arteries. The external iliac arteries become known as the femoral arteries when they reach the groin ar'ea. The external iliac arteries supply oxygenated blood to the feet and legs.

. When an arterial blockage returns' after balloon angioplasty, the process is referred to as restenosis.

. A "crash” is a catastrophic event, such as cardiac arrest or the cessation of breathing, that presents a life-threatening medical emergency. A cardiac arrest is a sudden cessation of heart function that results in the loss of effective circulation of blood.

. A "code” is an alert that is broadcast to emergency personnel to inform them that they are immediately needed to help a patient in a critical situation.

. A code team is a specially trained team of doctors and nurses who immediately respond when a patient needs resuscitation and advanced cardiac life support.

. In some parts of the record there is a reference to the intubation being done by an anésthesiologist rather than an emergency room physician.

. A breathing tube was inserted into Ms. Cochran’s lungs to facilitate breathing.

. Cardiopulmonary resuscitation, or CPR, is a technique for reviving a person whose heart and breathing have stopped.

. A pacemaker is a device that stimulates the heart to pump blood.

. Although the 8 millimeter balloon had been inserted into Ms. Cochran's right external iliac artery, the autopsy report showed that the perforation occurred in her right common iliac artery, a finding that Dr. Tam-pira found to be unexpected.

. A balloon tamponade procedure involves the insertion and inflation of a balloon where an artery has been perforated. This temporarily "plugs” the hole in the artery.

. Interventional cardiology is a branch of the medical specialty of cardiology that deals with the mechanical treatment of heart disease. Angioplasty is one of the procedures commonly performed by interventional cardiologists.