PAUL A. BONIN, Judge.
| Richard McCarter, who lost the sight in one eye, sued his ophthalmologist, Dr. Andrew Lawton, for malpractice.[1] The jury specially found that Mr. McCarter did not prove the standard of care owed by a specialist such as Dr. Lawton. Based on that finding, the trial judge rendered judgment dismissing with prejudice Mr. McCarter’s lawsuit. Mr. McCarter devol-utively appeals the dismissal. Because we conclude that the jury’s finding was not clearly wrong, we affirm. We explain our conclusion below.
I
Medical malpractice is defined by La. R.S. 40:1299.41(A)(8) to be:
Any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient ...
In order for a patient to prevail on a medical malpractice claim against his physician, the Legislature requires a patient to prove by a preponderance of the evidence all of the following three elements set out in La. R.S. 9:2794 (emphasis supplied):

12(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and tender similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
*346 (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The Louisiana Supreme Court in Pfiffner v. Correa, 94-0992 (La.10/17/94), 643 So.2d 1228, 1232-33, summarized the statutory burden:
Thus, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom, (emphasis added)
We focus on the first element of proof in this case because the jury, in its response to an interrogatory, see La. C.C.P. art. 1812, answered “No” to the following first, and (because of its answer) dispositive, question:
Did plaintiffs prove by a preponderance of the evidence the degree of knowledge or skill possessed or the degree of care ordinarily exercised by an ophthalmologist under the same or similar circumstances as Dr. Andrew Lawton? YES _NO_
| .¡Generally, we apply the rules of proof and standards of review applicable to ordinary negligence actions to professional negligence actions such as medical malpractice claims:
The plaintiff must prove a standard of care, a breach of that standard, causation and damages. Whether alleged malpractice constitutes negligence is a question for the jury, [citation omitted]. The manifest error rule also applies in appeals of medical malpractice actions. [citations omitted].
Stamps v. Dunham, 07-0095, p. 4 (La.App. 4 Cir. 9/19/07), 968 So.2d 739, 743 (emphasis added). The manifest error rule is captured by the instruction that “[a] court of appeal may not set aside the jury’s finding of fact in absence of ‘manifest error’ or unless it is ‘clearly wrong.’ ” Stobart v. State through DOTD, 617 So.2d 880, 882 (La.4/12/93); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The process for making that determination is set forth as
... a two-prong test for reversal of a factfinder’s determinations: (1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous, [citation omitted]. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.
Stamps v. Dunham, 07-0095 (La.App. 4 Cir. 9/19/07), 968 So.2d 739, 742-43.
Specifically, we treat the jury’s response to this particular interrogatory as a finding of fact, reviewable by us under the manifest error rule. See Beaucoudray v. Walsh, 07-0818, pp. 14 and 28 (La.App. 4 Cir. 3/12/09), 9 So.3d 916, 924 and 931, and Becker v. Tampira, 04-0200, pp. 18-21 (La.App. 4 Cir. 4/13/05), 901 So.2d 1157, 1167-1168. “Each of the burdens imposed on the plaintiff by La. R.S. 9:2794 is a question of fact.... As such, they are necessarily subject to, and our preview is curtailed by, the manifest error/clearly wrong standard of review.” Barre v. Nadell, 94-1883 (La.App. 4 Cir. 6/7/95), 657 So.2d 514, 519. When we apply the Ro-sell-Stoba.rt manifest error rule to a jury’s response to this particular interrogatory, if we find that the jury was not manifestly erroneous, we affirm the dismissal of the claim, see Beaucoudray, supra, and if we *347 find that the jury was manifestly erroneous, we consider evidence of the other elements de novo, see Becker, supra.
At this point it is helpful to emphasize that a patient, as well as the factfinder (whether judge or jury), is typically largely dependent upon the testimony of expert witnesses to establish the specialized standard of care. La. C.E. art. 702; Pfiffner, supra, 643 So.2d at 1230. See also Samaha v. Rau, 07-1726, pp. 5-6 (La.2/26/08), 977 So.2d 880, 884, and Djorghi v. Glass, 09-461, pp. 4-5 (La.App. 3 Cir. 11/4/09), 23 So.3d 996, 999 (stating, “Expert testimony is generally required for a medical malpractice plaintiff to establish the applicable standard of care unless the ‘negligence is ... obvious’ ”).
As we stated in Serigne v. Ivker, 00-0758, pp. 5-6 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787-88,
Expert testimony of professionals in the field is necessary to help the court determine what the standard was at the time in question and whether there has been a breach. Descant v. Administrators of Tulane Educational Fund, 95-2127 (La.App. 4 Cir. 1/21/98), 706 So.2d 618, 628.
Expert witnesses often disagree as to the standard of care applicable to a case. The amount of weight given to a particular expert’s testimony depends on the qualifications and experiences of the expert and on any studies used by the expert to render the opinion ... (citations omitted). When such a disagreement occurs, the trial court’s determination is given a great deal of deference. Jackson v. State Through Charity Hosp. of Louisiana at New Orleans, 94-2090 (La.App. 4 Cir. 5/16/95), 655 So.2d 795, 797.
The Louisiana Supreme Court in Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1277 (La.1991), has stated:
The determination of an expert’s credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review., e.g., Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1184 (La.App. 1st Cir.1985).
We have held that
[w]hen there is a conflict in the testimony, reasonable inferences of facts should not be disturbed upon review even though the Appellate Court may feel that its own evaluation and inferences are as reasonable. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
Becker v. Tampira, supra, 04-0200, pp. 17-18, 901 So.2d at 1166. When a factfin-der chooses between or among competing opinions of expert witnesses, we almost never find manifest error in that choice. We stated in Hubbard v. State, 02-1654, p. 11 (La.App. 4 Cir. 8/13/03), 852 So.2d 1097, 1103 that
In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact.
And in Ruiz v. Guette, 07-0989, p. 5 (La.App. 4 Cir. 4/23/08), 983 So.2d 959, 962, we stated:
Where medical experts express differing views, judgments and opinions, great deference is given to the fact finder’s determinations, which should not be reversed on appeal unless the reviewing court concludes that no reasonable factual basis exists for them.
*348 16Again, in Beaucoudray, supra, 07-0818 at p. 13, 9 So.3d at 924, we affirmed a jury’s finding that the patient failed to prove the standard of care when:
... the parties presented conflicting expert medical testimony on the issue of the correct standard of care, which the jury resolved in favor of the defendant doctors. In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the [province] of the jury as trier of fact.
In determining whether a plaintiff, such as Mr. McCarter, illustrated sufficiently and proved precisely what the applicable standard of care was in his case, this court too is guided by expert witnesses who are members of Dr. Lawton’s specialty or have knowledge of that area and are qualified to testify. Abdullah v. Simmons, 98-9564, p. 4 (La.App. 4 Cir. 9/13/00), 772 So.2d 698, 701. The expert’s qualifications and experience, as well as the facts, determine the weight to be given the expert’s testimony. Descant, supra, 95-2127 at p. 16, 706 So.2d at 628. The first criterion of the statutory requirements for proving medical malpractice— proving the applicable standard of care — is met by expert healthcare providers who testify specifically, and who may refer to scholarly texts or scientific data to educate the fact-finder and explain what acts, duties, or technical phenomena constitute the standard of care for a particular case or scenario involving the specific patient. See generally, Samaha, supra, 07-1726 at p. 5, 977 So.2d at 884; Pfiffner, supra, 643 So.2d at 1228.
Our review, then, of this verdict is first limited to determining whether the jury was clearly wrong in its factual finding that Mr. McCarter failed to prove that essential, indispensable element of his claim. We have held in D’Angelo v. Prechter, 03-1713, p. 4 (La.App. 4 Cir. 3/16/05), 899 So.2d 613, 616, that
17[i]f the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
As we explain further, however, because we conclude that the jury was not clearly wrong on this issue, we do not make a de novo review of the facts as Mr. McCarter would have us do.
II
Mr. McCarter injured his right eye in an automobile accident on August 18, 1996. Two days later he visited an optometrist, Dr. Glaser, who performed a comprehensive eye examination and prescribed new glasses to replace those broken in the accident. Dr. Glaser found normal intraocular pressure (IOP) and post-concussive syndrome consisting of Mr. McCarter's complaints of blurred vision. Dr. Glaser dilated Mr. McCarter’s eyes and performed a “depressed-scleral exam,” whereby the examiner uses a device or q-tip to push on the globe of the eye, a procedure done with the eye dilated.
Seven months later, in March of 1997, Mr. McCarter first experienced vision loss in his right eye. He returned to Dr. Glaser, who referred him to another optometrist, Dr. Feuer, who found IOP still normal but found a 25% loss of peripheral vision in the upper nasal quadrant of Mr. McCarter’s right eye. This was a “large, dark area with essentially no vision whatsoever.” Dr. Feuer referred Mr. McCar-ter to Dr. Andrew Lawton, a neuro-ophthalmologist.[2]
*349 The McCarters brought the relevant medical records to the first visit with Dr. Lawton, whose assistant took a history, particularly regarding Mr. McCarter’s right 18eye. She performed a visual acuity examination (eye-chart test). Dr. Lawton examined Mr. McCarter’s eyes, discussed his medical history, including the automobile accident injury and a family history of diabetes. He applied eye drops to check for abrasions. Dr. Lawton’s test of IOP revealed “extremely high” pressure in the right eye. Normal IOP is between 12-20 mmHG; Mr. McCarter’s IOP was 53 mmHG. Elevation of the IOP can result from detached retina as well as other causes, including “angle recession glaucoma.”
Dr. Lawton diagnosed “angle recession glaucoma” (which can be caused by blunt force trauma to the eye) based on his examination findings. He prescribed a medication to reduce the IOP and prevent further vision loss, and scheduled a return visit in two weeks.
Dr. Lawton’s office notes from the first office visit, on March 25, 1997, include abbreviations which Dr. Lawton explained represented his findings on the dilated examination: “M, V, P” stands for macula, retinal blood vessels, and peripheral retina, which he reported to be intact. These findings could be made only by performing an examination of a dilated eye. Mr. McCarter, however, states that no dilating drops were inserted in his eye by Dr. Lawton at this first visit. Dr. Lawton insists that although his system of note-taking used the abbreviations, MVP, and did not record the name of the dilating drops, nevertheless, he did dilate Mr. McCarter’s eyes on that first office visit.
At the second office visit, on April 8, 1998, Mr. McCarter’s IOP had dropped significantly, but needed to be reduced even further; an additional eyedrop was prescribed, and the diagnosis of glaucoma was not changed. Mr. McCarter’s visual acuity had diminished by fifty percent, and his vision loss had increased. He |flwas told to return to Dr. Lawton’s office in a week. Dr. Lawton and Mr. McCarter agree that no dilated examination was performed at the second office visit.
At the third office visit, on April 15, 1997, Mr. McCarter’s IOP had returned to normal, but his right eye visual acuity was poor — 80/20—and he reported more vision loss. On April 30, 1997, Mr. McCarter telephoned Dr. Lawton to report a total loss of vision in his right eye. He came to the clinic immediately, whereupon Dr. Lawton conducted a dilated examination and called in a retina specialist to examine Mr. McCarter. The resident retina specialist, Dr. Lin, performed a scleral depression examination and found a detached retina; a few hours later, Dr. James Diamond, a retina specialist, assisted by Dr. Lin, performed surgery placing a “scleral buckle” to save the retina, which had advanced from a dialysis, or tear, on the periphery of the retina, to a nearly complete detachment of the retina, including the macula.
Mr.McCarter was seen by other ophthalmologists subsequent to the 1997 surgery, with no improvement of his vision; he continues to take medications. He has had complaints of irritation of his eye, and impaired tear function. His employment and leisure enjoyments have been adversely affected by his vision diminution and discomfort related to it.
*350 III
In this Part we examine the expert medical testimony in light of Mr. McCarter’s contentions. Mr. McCarter contends that his permanent “legal” blindness in his right eye, with attendant pain and suffering and impairment in his life, was caused by Dr. Lawton’s deviation below the standard of care, specifically to perform dilated examinations of his right eye, and to diagnose and repair the retinal tear and detachment sooner than its discovery by the retinal specialists.
|10As we discussed in Part I, it is necessary that the patient, Mr. McCarter, establish the standard of care owed before we even undertake an inquiry as to whether Dr. Lawton deviated from that established standard of care.
Thus, our first task is to scrutinize the record in order to find a clearly enunciated standard of care, one which was made clear to the jury, instructing it what criteria or guidelines Dr. Lawton was to follow in treating his patient, Mr. McCarter. The burden of persuading the jury on this element is on the patient, not the physician. See La. C.E. art. 302(1). We understand Mr. McCarter’s major argument to us is that he proved to the jury that the standard of care required that Dr. Lawton dilate his eyes early in his treatment. But we are also aware that an important argument he made to the jury was that the standard of care required that retinal detachment be included as a differential diagnosis. We are also not unaware that Mr. McCarter also suggested to the jury, as a minor or subsidiary argument to the other two, that the standard of care included a specific method for explicitly recording in his medical records the fact of the dilation. We review the evidence to determine if the medical experts agree with Mr. McCarter on the standard of care.
A
We first address and dispose of the minor argument in order to focus more clearly on his major argument. Because there was a factual dispute between Mr. McCarter and Dr. Lawton as to whether Mr. McCarter was dilated at the first office visit, and because Dr. Lawton’s records did not explicitly state that he had dilated Mr. McCarter or identify the medication used to dilate, not inconsiderable time was spent evoking medical opinions from the expert witnesses about what kind of recordation or memorialization was required by the standard of care. Dr. |nJohn Sheppard and Dr. Charles Wilkinson, who were expert witnesses called by Mr. McCarter,[3] both stated that the standard of care required writing the words “dilated examination” and the name of the dilation substance. However, neither physician, both of whom teach medical students, cited a medical textbook or protocol requiring or prescribing this scribal rubric.
Dr. William Williamson and Dr. William Perez, both of whom served as members of the medical review panel and were called by Dr. Lawton, reported that the standard of care for an ophthalmologist such as Dr. Lawton did not require or prescribe rubrics of recordation of the dilated examination. They, together with Dr. Steven Newman as well as Dr. Lawton, testified *351 that the office notes are to record the findings, i.e. what is observed, as opposed to negatives, which conceivably could be extensive and irrelevant. While a technician (not a medical doctor) may note the substance used to dilate a patient’s eyes, a specialist physician, the ophthalmologist, in 1997, need note only the results of his or her examination. Dr. Newman offered that the technicians write down specific eye drops, and his staff sends pre-first visit letters advising that the eye examination will include dilation.
Moreover, the expert physicians were unanimous that the macula, vessels, and periphery of the eye can be seen only by means of dilation. The notation “MVP” in Dr. Lawton’s office notes was acknowledged to be an abbreviation known within the profession for these anatomical parts of the eye. Dr. Sheppard stated, “And that’s a standard abbreviation that everybody understands that the |, aback of the eye was looked at.” While other ophthalmologists might use the notation DFE, for “deep fundal examination,” to mean the same parts, the “shorthand” of both abbreviations was recognizable within the profession and ophthalmological specialty. Dr. Lawton’s notes showed that he found the macula, vessels, and periphery to be within normal limits.
The jury, then, heard conflicting expert testimony on Mr. McCarter’s assertion that an explicit recordation of dilation was incorporated in the standard of care. The jury also heard unanimous expert opinion that the recordation of “M, V, P” in the medical notes is a notation which would not be entered unless the eye was dilated. Thus, on the basis of the record, we surely cannot find that the jury would have been unreasonable in rejecting Mr. McCarter’s contention that an explicit recordation of the dilation was required by the standard of care.
B
We now address what we have characterized as an important argument made by Mr. McCarter to the jury regarding a differential diagnosis. We will follow that by addressing Mr. McCarter’s major argument to us regarding dilation.
Dr. Lawton initially diagnosed glaucoma and began treating that condition. Mr. McCarter suggested at trial, although not so pointedly here on appeal, that the standard of care required his ophthalmologist to include retinal detachment in his differential diagnosis. Dr. Sheppard certainly seems to support the suggestion because he concludes, based upon the optometrist’s record, that the retina “came off’ before the first visit with Dr. Lawton. Dr. Sheppard explained that the [ ^standard of care required Dr. Lawton to consider a potential retinal injury other than glaucoma and possible optic nerve; he said:
The standard of care indicates that the reason for the vision loss and the complaints needs to be discovered. And whatever it takes to discover that should be done. And clearly the most useful part of that examination would be the dilated exam to look at all of the retina.
Here again, however, the jury heard from Dr. Newman, Dr. Williamson, and Dr. Perez that there was no basis for including a differential diagnosis of retinal detachment on the March 25, 1997 visit, when angle recession glaucoma and an optic nerve defect, which had been seen by the optometrists who referred Mr. McCar-ter to Dr. Lawton, could solely account for Mr. McCarter’s vision complaints.
Thus, we cannot find that the jury would be unreasonable if it concluded that the differential diagnosis was not required by the standard of care, as the patient urged.
*352 Now we come to the argument upon which Mr. McCarter focuses us on his appeal. He argues that the standard of care required dilation at the first visit and, if not performed at the first visit, then certainly it was required at the second. We are convinced that the standard of care necessarily includes dilation at the first visit. All the physicians, including Dr. Lawton, agreed that a dilated-eye examination is properly a part of the first office visit for an ophthalmology patient and that such dilation was required by the standard of care. While dilation may be necessary, we are not convinced that dilation is sufficient to establish the standard of care owed by Dr. Lawton to Mr. McCarter.
On this critical point, we look to Dr. Wilkinson’s response to a specific question whether the standard of care required Dr. Lawton to perform a scleral | ^depression or make a referral for that purpose (several of the physicians explained that neuro-ophthalmologist such as Dr. Lawton would not perform the scleral depression examination but instead would refer the patient to a specialist whose specialty treated retinal problems).
Well, you get back to basics, and the basic-the essential element is a lack of dilatation. What was found after dilating, would, mandate a standard of care. As I mentioned, many, many fine ophthalmologists are very uncomfortable performing scleral depressions, so that’s a moot point. But the fact that he wasn’t dilated is what represents the breach of standard of care, (all emphasis added)
Because Dr. Wilkinson was convinced that Dr. Lawton had not dilated his patient, he neglected to inform the jury of what the standard of care would require if the patient in fact had been dilated. Dr. Sheppard testified in a pretrial deposition that a scleral depression was not required by the standard of care. He seemed to equivocate on this point at trial:
I have to answer that unfortunately without a yes or a no: yes if he was unable to see the periphery and no if he was able to see the periphery.... The fact that you’re not identifying the pathology is what we’re getting at, again.
Thus, the jury was aware that the standard of care required dilation but that dilation alone may not have been sufficient to meet the standard of care. Stated another way, Mr. McCarter had to persuade the jury either that a referral for a scleral depression was required by the standard of care following the necessary dilation or that such a referral was not required by the standard of care. With this important matter unanswered in the evidence, we cannot find that the jury was unreasonable in finding that Mr. McCarter did not sufficiently establish the standard of care which is required once the diagnostic dilation has occurred.
_bC
We turn now to a brief discussion of additional information which the jury was given concerning the standard of care, which information undoubtedly contributed to its finding of fact that Mr. McCarter did not prove the standard of care.
In a medical malpractice case, the medical review panel’s opinion is admissible as substantive evidence. La. R.S. 40:1299.37 H; Williams v. Memorial Medical Center, 03-1806, p. 15 (La.App. 4 Cir. 3/17/04), 870 So.2d 1044, 1054, fn. 6. (citing Pfiffner, supra). The opinion and reasons of the medical review panel were introduced into evidence for the jury’s consideration. Dr. Daniel Caplan along with Dr. Williamson and Dr. Perez constituted the medical review panel. While its opinion did not set forth precisely or specifically the standard of care Dr. Lawton owed to Mr. McCarter, *353 the panel decided that Dr. Lawton did not deviate from the applicable standard of care with the following description:
Dr. Lawton properly conducted an initial examination of the patient. He correctly diagnosed glaucoma of the right eye and instituted appropriate treatment. There is no evidence that the patient had retinal detachment at that point. Throughout Dr. Lawton’s treatment the patient’s vision was consistent with significant elevated pressure and resulting optic nerve damage.
In determining whether Mr. McCarter had proved the standard of care, the jury processed other important findings. These included the records brought by Mr. McCarter from his optometrists to Dr. Lawton which indicated a diagnosis of glaucoma, with significantly elevated IOP of 53. According to Dr. Newman, Dr. Williamson, and Dr. Perez, the prescription of medication to reduce the pressure and initial instruction to return to the office in two weeks were appropriate |! ¡¡treatment within the standard of care. Moreover, these physicians observed that by the second office visit, Mr. McCarter’s extremely high IOP had declined significantly, and the course of treatment for glaucoma set by Dr. Lawton was progressing.
Additionally, the jury learned from Dr. Newman and others that Mr. McCarter may suffer from a rare medical condition which complicates a diagnosis. The condition is known as the Schwartz-Matsuo syndrome, a syndrome characterized by retinal tear and detachment accompanied by elevated intraocular pressure. Dr. Wilkinson called it extremely rare; Dr. Sheppard called awareness of the syndrome “roundsmanship,” meaning that the occurrence of this syndrome is so rare and obscure that it would not be generally used. Dr. Perez commented on the rarity of it; almost “unheard of’ is how he described the syndrome. Dr. Newman underscored the obscurity of the syndrome by observing that it was not included in Dr. Wilkinson’s textbook on the retina. Dr. Perez testified that the findings for Mr. McCarter were so classically those of glaucoma that the standard of care was to “go on what you see,” i.e., to treat for the glaucoma presented by the patient.
Dr. Lawton was not obliged to prove the standard of care. Medical witnesses informed the jury that there was a standard of care and that Dr. Lawton’s treatment, sometimes specified and sometimes not, was within the standard of care.
In the end we find that on each issue (besides the dilation issue) which Mr. McCarter urged to the jury as a requirement of the standard of care, the jury had specific expert opinion to the contrary. The jury’s reliance on such specific medical expertise compels us to conclude that it was not clearly wrong in deciding that an explicit recordation of dilation was not required by the standard of care and that the | ^standard of care did not require a differential diagnosis of a retinal tear or a differential diagnosis of Schwartz-Matsuo syndrome.
Although dilation was established as a necessary procedure for the standard of care, the evidence as a whole clearly shows that dilation alone is not sufficient to establish the standard of care. The evidence as a whole is unclear whether referral for scleral depression was required after the dilation, but of course it was for Mr. McCarter to establish whether or not a referral for scleral depression was also necessary.
Finally, we consider as well the nonspecific and conclusory opinion of several experts, as well as the opinion of the medical review panel itself, that a standard of care exists for the treatment and that Dr. *354 Lawton’s conduct met the standard in our conclusion that the jury’s finding was reasonable.
Because we conclude that the jury was not clearly wrong on all of these issues, and that its choice of certain medical experts’ opinions over those of competing experts was reasonable, we find no manifest error in its factual finding that Mr. McCarter did not prove the standard of care owed to him by Dr. Lawton.
IV
Because of our finding, we cannot substitute our view of the facts for that of the jury. Consequently, as we noted in Part I, it is unnecessary for us to conduct a de novo review as we did in Becker, supra. Because Mr. McCarter did not prove the standard of care, we pretermit addressing his second assignment of error which seeks a finding from us that Dr. Lawton deviated from the standard of care.
Mr. McCarter also complains that the trial judge’s ejection in the presence of the jury of one of his attorneys from the courtroom prejudiced his cause. Mr. McCarter’s trial counsel had objected to a question posed to a witness by Dr. 118Lawton’s counsel. Despite having been previously admonished by the trial judge for similar conduct, another one of Mr. McCarter’s attorneys blurted out a mild reproach to opposing counsel. The trial judge ordered the offending counsel outside the courtroom at which time the lawyer apologized to the trial judge. At no time was objection made to the lawyer’s ejection.
In civil cases, while the parties have primary responsibility for presenting the evidence and examining the witnesses, the trial judge maintains reasonable control over the presentation of evidence and the interrogation of witnesses, including obviously objections to questions of opposing counsel. See La. C.E. art. 611 A.[4] As an officer of the court, the attorney “shall conduct himself at all times with decorum ... and shall not interrupt opposing counsel.” La. C.C.P. art. 371. “The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done.” La. C.C.P. art. 1631 A.
Because the trial judge had previously cautioned Mr. McCarter’s counsel about interjecting himself inappropriately, and pointedly stated to Mr. McCarter’s trial counsel in the presence of the jury that he was “not attributing anything negative to you or your client,” we think it highly unlikely that the judge’s reaction to counsel’s provocation was prejudicial to the jury’s deliberations in this case involving serious injury to Mr. McCarter and touching upon the professional 11;,competence and reputation of a physician. We review this assignment of error under the abuse of discretion standard. We conclude that the trial judge did not abuse his discretion when he ejected counsel from the courtroom in the presence of the jury.[5]
*355 DECREE
Having concluded that the jury’s finding that Mr. McCarter did not prove the standard of care applicable to Dr. Lawton is not clearly wrong and is reasonable, we affirm the judgment dismissing the lawsuit with prejudice.
AFFIRMED.
LOVE, J., Concurs in the Result.

. Mr. McCarter's wife joined him as a party plaintiff, asserting a derivative claim for loss of consortium. See La. R.S. 40:1299.42; Coleman v. Deno, 99-2998, p. 40 (La.App. 4 Cir. 4/25/01), 787 So.2d 446, 474.

. A neuro-ophthalmologist specializes in disorders of the optic nerve, both inside and outside the eye.

. Although these ophthalmologists were retained by Mr. McCarter, just as Dr. Newman, Dr. Williamson, and Dr. Perez were retained or called as witnesses by Dr. Lawton, we declined to identify them as either party's expert witness. See Safeguard Storage Properties, L.L.C. v. Donahue Favret Contractors, Inc., 09-0344 (La.App. 4 Cir. 5/27/09), 13 So.3d 244, 248 (Bonin, J., concurring): “While experts may sometimes be perceived to be in the 'swearing-for-hire business,’ under our statutory provisions, the expert witness is not an advocate for one side or the other.”

. Article 611 A reads:
Except as provided by this Article and the Code of Criminal Procedure Article 773, the parties to a proceeding have the primary responsibility of presenting the evidence and examining the witnesses. The court, however, shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to:
(1) Make the interrogation and presentation effective for the ascertainment of the truth;
(2) Avoid needless consumption of time; and
(3) Protect witnesses from harassment or undue embarrassment.

. We note that the ejection is a lesser sanction than a finding of contempt, which is also authorized. See La. C.C.P. art. 371.